Jacqueline De Villoutrey PAIN, as surviving spouse, and Marie Frederique Pain De Wavrechin, Yves Emmanuel Pain, and Jean Olivier Pain, as surviving children of Jacques Pain, Appellants,

v.

UNITED TECHNOLOGIES CORP.

Sigrun FRANTZEN, individually, and as guardian of Jan Ivar Frantzen, Knut Erik Frantzen, and Arild Frantzen, children of Frederik Johan Frantzen, Appellants,

v.

UNITED TECHNOLOGIES CORP.

Eslinda CHRISTOPHERSEN, individually, and as guardian of Raymond Ivar Christophersen and Sonya Christophersen, children of Kjell Ivar Christophersen, Appellants,

v.

UNITED TECHNOLOGIES CORP.

Ingjerd KAHN, as surviving wife, and as mother of Jaysen Kahn, infant son of Dennis Iver Kahn, and of his unborn child

and

Naomi Kahn, as surviving mother of Dennis Iver Kahn, Appellants,

v.

UNITED TECHNOLOGIES CORP.

Bette Irene SIBTHORPE, individually, and as guardian of Graham Edward Sibthorpe, son of Keith Edward Sibthorpe, Appellants,

v.

UNITED TECHNOLOGIES CORP.

Nos. 79–1730 to 79–1734.

United States Court of Appeals, District of Columbia Circuit.

Argued 25 April 1980.

Decided 17 Nov. 1980.

Charles F. Krause, New York City, with whom Philip Silverman, Daniel F. Hayes, New York City, and J. Michael Sconyers, Washington, D.C., were on brief, for appellants.

Lewis T. Booker, Richmond, Va., with whom L. Neal Ellis, Jr., Richmond, Va., was on brief, for appellee.

Before WILKEY, WALD and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

■ In this case we consider whether the trial judge abused his discretion by conditionally dismissing the appellants' consolidated wrongful death actions on grounds of *forum non conveniens.* The scope of our review in this matter is limited; a federal district court has the inherent power to dismiss an action which it deems an imposition upon its jurisdiction so long as an adequate alternative forum is available and so long as the trial judge has carefully "weigh[ed the] relative advantages and obstacles to fair trial"[1] and, taking into consideration the plaintiff's original choice of forum, found the balance of public and private interests to favor dismissal.[2] When appraising a lower court's *forum non conveniens* determination, an appellate court may not substitute its judgment for that of the district court in the absence of a clear abuse of discretion.[3] For reasons set out in greater detail below, we affirm.

## I. BACKGROUND

On 26 June 1978 a helicopter en route from Bergen, Norway to an offshore oil drilling platform crashed into the North Sea approximately eighty-seven miles from its point of departure. The helicopter, which had been designed and manufactured by the Sikorsky division of defendant United Technologies Corporation (UTC), was owned and operated by Helikopter Service, A.S. (Helikopter), a Norwegian corporation.[4] Among those killed in the crash were Jacques Pain, a French citizen and domiciliary; Frederik Johan Frantzen, a Norwegian citizen and resident; Keith Edward Sibthorpe, a British citizen and resident; Dennis Iver Kahn, an American citizen residing in Norway; and Kjell Ivar Christophersen, a Norwegian resident holding dual Norwegian-Canadian citizenship.[5]

Following the crash, the Norwegian Civil Aviation Administration conducted an official investigation of the action, in which defendant UTC participated.[6] The records of that investigation, the officials who conducted it, the flight crew, and the wreckage of the helicopter itself are all currently located in Norway.[7] Shortly thereafter, decedents' survivors brought five separate wrongful death actions against UTC in the district court, alleging both diversity jurisdiction[8] and mandatory jurisdiction based on the Death on the High Seas Act[9] (DOHSA). Plaintiffs' complaints, which sounded in breach of warranty, strict liability, and negligence, sought compensatory damages

1. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947) [hereinafter *Gilbert*].

2. *Id.* at 508–09, 67 S.Ct. at 843. *See also* text accompanying notes 29–30 *infra* (listing private and public interests to be balanced).

3. *See, e. g., The Belgenland,* 114 U.S. 355, 368, 5 S.Ct. 860, 866, 29 L.Ed. 152 (1885); *Paper Operations Consultants Int'l Ltd. v. SS Hong Kong Amber,* 513 F.2d 667 (9th Cir. 1975) (appellate court's role is not to determine how it would have exercised its jurisdiction had the facts been presented to it; rather, appellate court may reverse only if district court's ruling constitutes an abuse of discretion).

4. Plaintiffs' Complaint, *reprinted in* Joint Appendix (J.A.) at 2a; Affidavit of Robert H. Arnold, *reprinted in* J.A. at 78a–80a.

5. Brief of Appellants at 5–6.

6. Brief of Appellants at 7; Brief on behalf of Appellee at 4.

7. Brief on behalf of Appellee at 4.

8. J.A. at 1a.

9. 46 U.S.C. § 761 *et seq.* (1976); J.A. at 5a.

totalling five million dollars, plus punitive damages.[10]

With a single exception, all of the plaintiffs—widows and surviving children of the decedents—reside abroad. The sole American plaintiff, the mother of the deceased Kahn, is an American citizen residing in New Hampshire.[11] Helikopter, the owner-operator of the helicopter involved in the fatal accident, has no contacts with the United States and hence, stands outside the personal jurisdiction of American courts.[12] Thus United Technologies Corporation, a Delaware corporation with its principal place of business in Hartford, Connecticut remains the sole defendant.

On 29 March 1979 following the submission of memoranda and a hearing before the district court, the Honorable George L. Hart, Jr. entered five separate orders granting UTC's motions to dismiss these actions on grounds of *forum non conveniens*.[13] Judge Hart conditioned the dismissals on stipulations made by UTC which were to apply if suit were later brought in Norway or in the *Pain, Christophersen,* and *Sibthorpe* cases, in France, Canada, and the United Kingdom, respectively. UTC stipulated its consent to personal jurisdiction in the foreign court where plaintiffs might subsequently bring suit, agreed to waive any defense of statute of limitations were such a suit to be brought within one year of the date of dismissal, and most significantly, agreed to proceed directly to trial only on the issue of damages, without contesting liability, in any suit filed by plaintiffs outside the United States.[14]

■ Pursuant to our order of 20 July 1979, these actions have been consolidated upon appeal. A thorough consideration of the record convinces us that no abuse of discretion occurred here; Judge Hart carefully evaluated all factors relevant to determining a *forum non conveniens* motion before concluding that a conditional dismissal was appropriate. Furthermore, our own evaluation of those factors, coupled with our understanding of applicable law, convinces us that conditional dismissal was particularly appropriate here because more serious obstacles to fair trial exist in this forum than in alternative forums abroad. After a brief discussion of the jurisdictional issues presented by this case, we will proceed to analyze the district court's ruling on *forum non conveniens*.

## II. MANDATORY JURISDICTION OVER THE DOHSA CLAIM

■ The appellants first argue that because their DOHSA claim "arises under the laws of the United States" within the meaning of the district court's federal question jurisdiction,[15] assumption of jurisdiction was therefore mandatory. In support of this contention appellants cite Chief Justice Marshall's oft-quoted passage from *Cohens v. Virginia* :[16]

It is most true, that this court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction if it should.... With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution.

■ To appellants' contentions on this first point, we note simply that no claim can be made that the district court had

---

10. Plaintiffs' Complaint, *reprinted in* J.A. at 2a–7a.

11. Plaintiffs' Complaint, *reprinted in* J.A. at 1a–2a.

12. Brief on behalf of Appellee at 3–4.

13. *Kahn v. United Technologies Corp.*, No. 78–2035 (D.D.C. 29 Mar. 1979), *reprinted in* J.A. at 8a–11a.

14. *Id.*

15. 28 U.S.C. § 1331 (1976).

16. 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821).

mandatory jurisdiction in this case because appellants' complaints failed to invoke federal question jurisdiction.[17] The DOHSA, upon which appellants rely, provides only that a suit for damages may be maintained "in the district courts of the United States, *in admiralty.*"[18] Since it is well accepted that suits in admiralty do not fall within the compass of federal question jurisdiction,[19] we reject appellants' assertions regarding mandatory jurisdiction.

## III. THE STANDARD TO BE EMPLOYED IN DECIDING *FORUM NON CONVENIENS* MOTIONS

 Unlike issues of jurisdiction, determinations of *forum non conveniens* are not pure questions of law; rather they represent exercises of structured discretion by trial judges appraising the practical inconveniences posed to the litigants and to the court should a particular action be litigated in one forum rather than another.[20] Thus, the principal question to be decided here is whether the district court abused that discretion by dismissing appellants' suits on grounds of *forum non conveniens.* In deciding this question, we assume—and appellee does not suggest otherwise—that, but for the application of the *forum non conveniens* doctrine, the district court had proper jurisdiction over these consolidated

actions. We therefore consider only whether the lower court properly renounced that jurisdiction by invoking the doctrine of *forum non conveniens* here.

### A. *The Supreme Court Decisions in* Gilbert *and* Koster

The parties fundamentally differ over the proper standard to be applied under the *forum non conveniens* doctrine. Their dispute centers around their disagreement as to whether this case is governed by the Supreme Court's decision in *Gulf Oil Corp. v. Gilbert,*[21] or by the companion decision, *Koster v. Lumbermens Mutual Casualty Co.*[22] Although *Gilbert* and *Koster* were decided together and authored by the same Justice, in each case the Supreme Court used slightly different language, and at least arguably different approaches, in applying the doctrine of *forum non conveniens.*

The district court relied primarily on *Gilbert,* a decision that UTC represents as establishing a "balance of conveniences" test for dismissal on grounds of *forum non conveniens.*[23] The appellants, however, urge that this court apply *Koster,* which they suggest requires a showing that plaintiffs' choice of forum is "vexatious and oppressive" before dismissal becomes proper.[24]

**17.** Furthermore, notwithstanding the cited dictum from *Cohens,* later cases have at least suggested that there is no *unqualified* rule barring the prudential dismissal of cases resting on federal question jurisdiction. *See, e. g., Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Chamber of Commerce v. Dep't of Energy,* 627 F.2d 289 (D.C.Cir.1980).

**18.** *See* 46 U.S.C. § 761 (1976) (emphasis added). In this respect, DOHSA differs from the Jones Act, 46 U.S.C. § 688 (1976), which provides that seamen injured in the course of their employment may "maintain an action for damages *at law* " (emphasis added). At least one court has held the Jones Act to invoke federal question jurisdiction, and thus to prohibit dismissal of an action brought under the Act. *See Bartholomew v. Universe Tankships, Inc.,* 263 F.2d 437, 443 (2d Cir.), *cert. denied,* 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959).

**19.** *See Romero v. International Terminal Operating Co.,* 358 U.S. 354, 373, 79 S.Ct. 468, 480, 3 L.Ed.2d 368 (1959).

**20.** The federal court decisions since *Gilbert* regarding *forum non conveniens* dismissals to foreign forums under common law principles have been extensively canvassed in Note, *The Convenient Forum Abroad,* 20 Stan.L.Rev. 57 (1967), and Note, *The Convenient Forum Abroad Revisited: A Decade of Development of the Doctrine of Forum Non Conveniens in International Litigation in the Federal Courts,* 17 Va.J.Int'l L. 755 (1977).

**21.** 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

**22.** 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947).

**23.** *See* Brief on behalf of Appellee at 6–26.

**24.** *See* Brief of Appellants at 21–23.

*Gilbert* and *Koster* together extended the doctrine of *forum non conveniens* for the first time beyond its historical roots in admiralty and equity.[25] In *Gilbert* a Virginia resident brought a diversity action in the Southern District of New York alleging that his warehouse, located in Virginia some 400 miles away, had been negligently burned by Gulf, a defendant doing business in New York and Pennsylvania.[26] After the district court had dismissed the case on *forum on conveniens* grounds, the Second Circuit reversed. In upholding the district court's dismissal, Justice Jackson articulated both a general principle—"that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized . . ."[27] —and a set of criteria which courts might apply to effectuate that principle when choosing between two forums where the defendant is equally amenable to process. While cautioning that "[t]he doctrine leaves much to the discretion of the court to which plaintiff resorts,"[28] Justice Jackson set forth two lists of factors that remain to this day the primary sources of guidance for trial courts applying the *forum non conveniens* doctrine: those factors relevant to the convenience of the litigants and those relevant to the convenience of the forum. The Court defined the "private interest factors" as:

> [T]he relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions to the enforcibility [sic] of a judgment if one is obtained. The court will

weigh relative advantages and obstacles to fair trial.[29]

The "public interest factors," by contrast, were set out as follows:

> Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.[30]

*Koster*, decided together with *Gilbert*, was a shareholder's derivative action brought in the Eastern District of New York by a New York resident against three Illinois defendants. As in *Gilbert*, the Court *upheld* dismissal of the case on *forum non conveniens* grounds. In reaching this conclusion, however, Justice Jackson observed that:

> Where there are only two parties to a dispute, there is a good reason why it should be tried in the plaintiff's home forum if that has been his choice. He should not be deprived of the presumed advantages of his home jurisdiction except upon a clear showing of facts which either (1) establish such oppressiveness and vexation to a defendant as to be out

25. For a discussion of the history and evolution of the doctrine of *forum non conveniens, see generally* Bickel, *The Doctrine of Forum Non Conveniens As Applied in the Federal Courts in Matters of Admiralty,* 35 Cornell L.Q. 12 (1949) [hereinafter Bickel]; Barrett, *The Doctrine of* Forum Non Conveniens, 35 Cal.L.Rev. 380 (1947) [hereinafter Barrett]; Blair, *The Doctrine of Forum Non Conveniens in Anglo-American Law,* 29 Colum.L.Rev. 1 (1929).

26. 330 U.S. at 502–03, 67 S.Ct. at 840.

27. *Id.* at 507, 67 S.Ct. at 842.

28. *Id.* at 508, 67 S.Ct. at 843.

29. *Id.*

30. *Id.* at 508–09, 67 S.Ct. at 843.

of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems.[31]

Although the language in these decisions may suggest slightly different approaches to the problem, we do not read *Gilbert* and *Koster* as establishing different standards for dismissal on grounds of *forum non conveniens*. Rather, we agree with the view recently expressed by the Second Circuit that *Koster* must be seen as "a consistent, pragmatic application of *Gilbert*, rather than an exception to it."[32] At the outset, both *Gilbert* and *Koster* require that two alternative forums have jurisdiction over the subject matter and parties in the suit before the doctrine of *forum non conveniens* even comes into play. The two cases then jointly suggest that the trial judge has discretion to balance the interests of the plaintiffs, the defendant, *and* the forum as part of an overall "weigh[ing of the] relative advantages and obstacles to fair trial" in the *particular* forum where suit is first initiated.[33] In balancing these three sets of interests, a trial judge must give considerable, but not conclusive, weight to the plaintiffs' initial forum choice. While "the plaintiff may not, by choice of an inconvenient forum, 'vex,' 'harass,' or 'oppress' the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy,"[34] "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."[35] Thus, the plaintiff's choice of forum is more than just one factor that the trial judge must consider when balancing equities between two alternative forums. Trial judges do not have unchecked discretion to dismiss cases from a plaintiff's chosen forum simply because another forum, in the court's view, may be superior to that chosen by the plaintiff.[36] As this court concluded in *Founding Church of Scientology v. Verlag*:[37]

> A trial judge has great but not unlimited discretion to apply the doctrine of *forum non conveniens*. Where there has been no *weighing* of the relative advantages of each forum but only a consideration of the drawbacks of one, that discretion has been abused.

To recognize that *forum non conveniens* was never designed to permit forum shopping by defendants does not, however, compel the conclusion that the doctrine condones forum shopping by *plaintiffs*. The fact that the Supreme Court in *Gilbert* and *Koster* chose to accord the plaintiff's choice of forum only presumptive, rather than conclusive, weight suggests that trial judges should resist plaintiffs' understandable "temptation to resort to a strategy of forcing the trial at a most inconvenient place for an adversary, even at some inconvenience to himself."[38] The late Professor Bickel recognized the abuse potentially resulting if the plaintiff's freedom of forum choice knew no bounds:

**31.** *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524, 67 S.Ct. 828, 831, 91 L.Ed. 1067 (emphasis added) [hereinafter *Koster*]. It is worth noting that this dictum is not precisely on point here, since there are many more than two parties to this dispute.

**32.** *Alcoa S. S. Co. v. M/V Nordic Regent*, No. 1558, Docket No. 78–7054, at 5955 (2d Cir. 25 Feb. 1980) (en banc) [hereinafter *Alcoa en banc*].

**33.** *Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055.

**34.** *Id.*

**35.** *Id.*

**36.** As the Supreme Court noted in *Koster*, "In any balancing of conveniences, a real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown." 330 U.S. 518, 524, 67 S.Ct. 828, 831, 91 L.Ed. 1067.

**37.** 536 F.2d 429, 436 (D.C. Cir. 1976) (emphasis in original) (reversing dismissal where plaintiff and one defendant are U.S. residents and plaintiff sought damages for libelous publication in the District of Columbia).

**38.** *Gilbert*, 330 U.S. 501, 507, 67 S.Ct. 839, 842, 91 L.Ed. 1055.

The problem of *forum non conveniens* is really an obvious one. It is this: How much freedom is a plaintiff to have in choosing the place where he wishes to bring suit. He once had next to none. In modern times he has been largely freed of rigid venue restrictions, and been given an area of discretion so wide that, in the judgment of many commentators, he is able to abuse it. He may bring suit in the forum in which, for various reasons, it is most cumbersome and expensive for the defendant to present his case. Many a settlement unduly favorable to the plaintiff has been hastened in this manner. Or he may for some extreme reasons prefer a forum other than the one which the defendant would like to see chosen. Plaintiff may sue in that part of the country in which juries are least likely to be startled by and most likely to grant a large verdict.... In the process of thus getting the full advantage of their positions, plaintiffs often overcrowd the dockets of a small number of popular courts, and burden judges with unnecessary and difficult decisions on points of conflict of laws and with unaccustomed and therefore not the most skilful consideration of the laws of another jurisdiction.[39]

▮▮▮ In short, trial judges applying the doctrine of *forum non conveniens* must walk a delicate line to avoid implicitly sanctioning forum-shopping by either litigant at the expense of the other. Defendants bear a heavy burden of establishing that plaintiffs' choice of forum is inappropriate and that the action should therefore be dismissed. At the same time, however, a plaintiff cannot merely argue that his forum choice deserves blind deference because it does not rise to the level of an abuse of process which is "vexatious" or "oppressive" to the defendant. As our colleague Judge Ginsburg has suggested:

At the least, a plaintiff who chooses [a competent but clearly inappropriate forum in which to bring suit] *should be required to show some reasonable justification for his institution of the action in the forum state rather than in a state with which the defendant or the res, act or event in suit is more significantly connected.*[40]

▮▮▮ The analysis above suggests that when private equities are in equipoise, even with the extra deference accorded to plaintiffs' choice of forum, the *Gilbert* factors of *public* convenience must ultimately guide the trial judge in deciding whether or not to grant a motion to dismiss. As Judge Braucher has noted, in such cases

*[f]orum non conveniens* is more appealing when considered as a discretionary adjunct to the rules regulating place of trial. The parties may have legitimate differences as to the appropriate place to try the lawsuit, differences which cannot always be satisfactorily resolved by rules of jurisdiction, venue, and service of process. *It may be better to have them resolved under the discretion of an impartial judge than by the unfettered option of either party.*[41]

▮▮▮ Thus, a district judge's *forum non conveniens* inquiry should proceed in four steps. As a prerequisite, the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case. Next, the trial judge must consider all relevant factors of *private* interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice. If the trial judge finds this balance of private interests to be in equipoise or near equipoise, he must then determine whether or not factors of *public* interest tip the balance in favor of a trial in a foreign forum. If he decides that the

---

39. Bickel, *supra* note 25, at 14–15.

40. Ginsburg, *The Competent Court in Private International Law: Some Observations on Current Views in the United States*, 20 Rutgers L.Rev. 89, 100 (1965) (emphasis added) [hereinafter Ginsburg].

41. Braucher, *The Inconvenient Federal Forum*, 60 Harv.L.Rev. 908, 931 (1947) (emphasis added).

balance favors such a foreign forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

## B. *The District Court's Decision*

The trial court record indicates that Judge Hart weighed all relevant factors in making his *forum non conveniens* ruling. In conditionally granting defendant's motion to dismiss, he accomplished each of the necessary steps described above. As the record makes clear, Judge Hart first acknowledged the existence of a number of possible alternative forums with jurisdiction over the action.[42] He then went on systematically to weigh each of the factors which *Gilbert* requires be accounted for when considering the balance of conveniences for private litigants.[43] Not only did Judge Hart consider the drawbacks of the local forum as measured by the above criteria,[44] he contemplated as well the relative superiority of an alternative forum, Norway.[45] Finding these considerations to favor dismissal, Judge Hart then articulated a number of factors of public interest which tipped the balance even further away from that original forum, most significantly, the likely applicability of foreign law to the resolution of the central legal issues in the case.[46]

On that basis he then sought to secure adequate alternative forums for appellants. By entering dismissal only on the condition that UTC agree to submit to the jurisdiction of the various foreign courts of appellants' choice, Judge Hart ensured that the defendant would both appear and defend in an alternative forum. By requiring the defendant not to contest liability in those foreign jurisdictions and to proceed to trial only on the issue of damages, he exacted a concession from UTC as the price for permitting it to shift the case from plaintiffs' chosen forum. By requiring waiver of foreign statutes of limitations, he effectively forced UTC to waive any advantage it might have gained from delay. Finally, by expressly providing that the suits could be reopened in the United States without prejudice should any of the stipulated conditions fail to materialize, Judge Hart protected the plaintiffs' right to reinstitute and try the case while simultaneously encouraging plaintiffs to try that case in a nation more closely connected to the event giving rise to the suit.[47]

■ None of these precautions suggest to us an abuse of discretion. Indeed, except for a single defect in the record, this cursory review alone would convince us to affirm. In one respect, however, we find the trial court record lacking; it nowhere explicitly states how much weight the district judge chose to give to the rebuttable presumption in favor of appellants' initial forum choice when he balanced the private conveniences of the litigants. Upon examination, however, we find the lack of specificity in the record on this issue—the only issue properly remaining on review—insufficient to justify reversal. There are two related reasons why we nonetheless affirm Judge Hart's decision as a reasonable exercise of trial court discretion.

42. J.A. at 14a (Connecticut), 48a (Norway).

43. *Compare id.* at 48a–51a *with* text accompanying note 29 *supra.*

44. *Id.*

45. *Id.* Thus, unlike *Verlag, see* note 37 *supra,* this was not a case where there was no weighing at all.

46. *Id.* at 49a. *See also* text accompanying note 30 *supra.*

47. *Kahn v. United Technologies Corp.,* No. 78-2035 (D.D.C. 29 Mar. 1979), *reprinted in* J.A. at

8a–11a. Under similar circumstances both federal and state courts have dismissed cases when a foreign court clearly presented a more convenient forum. *See Mizokami Bros. v. Baychem Corp.,* 556 F.2d 975 (9th Cir. 1977) (upholding district court's dismissal of complaint to the nation most closely connected with event giving rise to suit). *See also Universal Adjustment Corp. v. Midland Bank, Ltd.,* 281 Mass. 303, 315–17, 184 N.E. 152, 159 (1933) (state court dismissed claim to England despite plaintiff's residence in-state when claim based on event connected with England).

First, even acknowledging that the *Gilbert-Koster* presumption places a heavy burden on the defendant to establish that the plaintiff's choice of forum is *not* appropriate, we believe that the defendant here has in fact carried its heavy burden. The defendant has presented substantial and compelling evidence of both *public* and *private* factors which indicate the inferiority of the plaintiffs' chosen forum to other overseas. We find the factors favoring dismissal here sufficiently weighty to overcome even the strong *Gilbert-Koster* presumption in favor of plaintiff's forum choice.

Secondly, despite the fact that the trial court failed explicitly to recognize the presumption in favor of plaintiffs' choice of forum, our review of the record convinces us that this is not a case where the *Gilbert-Koster* presumption comes into play with maximum force. The record here suggests that the connection between these plaintiffs, the controversy, and the chosen forum was so attenuated that plaintiffs' choice of forum deserved little deference from the trial court. We shall proceed to detail each of these two reasons below.

## IV. FACTORS FAVORING FORUM NON CONVENIENS DISMISSAL

### A. *Factors of Private Interest*

■ When a court evaluates the private factors relevant to a *forum non conveniens* determination, *Gilbert* requires that it "weigh relative advantages and obstacles to fair trial" in alternative forums, paying special heed to the "practical problems that make trial of a case easy, expeditious and inexpensive." [48] In dismissing the instant actions, the district court conducted an analysis along the lines laid down by *Gilbert*. The first factor considered by the lower court was relative ease of access to sources of proof. On this point the district court found the balance to be "very heavily in favor of Norway in this case," both as to liability and to damages.[49] Similar findings were made with respect to the related considerations of the availability of compulsory process for attendance of unwilling witnesses,[50] the cost of obtaining attendance of willing witnesses,[51] and the possibility of viewing the premises where the accident occurred.[52]

### 1. *Relative Ease of Access to Sources of Proof*

■ To evaluate whether the district judge correctly appraised the relative ease of access to sources of proof, we must first understand what theories of the case each party will seek to prove in alternative forums. UTC's liability would be at issue only if the trial were conducted in the United States.[53] Thus, if the trial were to take place in the District of Columbia, plaintiffs would seek to prove, as alternative theories of liability, a defect in the design or manufacture of the helicopter giving rise to strict liability, breach of warranties, and negligent manufacture or design of the aircraft.[54] UTC's defense, on the other hand, would presumably rest on the theory that the accident, if traceable to human fault at all, was caused by improper maintenance or operation of the aircraft by the owner-operator Helikopter. With respect to each of the plaintiffs' causes of action, UTC's ability to prove Helikopter's fault would constitute an affirmative defense arguably freeing UTC from liability.[55] That defense, in

48. 330 U.S. at 508, 67 S.Ct. at 843.

49. J.A. at 48a.

50. *Id.*

51. *Id.* at 48a–49a.

52. *Id.* at 49a.

53. *See* note 14 *supra* and accompanying text.

54. *See* note 10 *supra* and accompanying text.

55. With respect to the cause of action based on strict liability, the parties disagree as to whether the burden is on the *plaintiffs*, in establishing proximate cause, to show that the accident was *not* caused by fault on the part of Helikopter. *Cf. Stewart v. Ford Motor Co.*, 553 F.2d 130, 137 (D.C.Cir.1977). If the plaintiffs are under no such burden, then the discussion with respect to the other causes of action is applicable here. If the plaintiffs must affirmatively present facts relating to the care and use of the helicopter in Norway, then the plaintiffs them-

turn, depends almost entirely upon demonstrative, documentary, and testimonial evidence located in Norway and immune from the compulsory process of American courts. Documents such as the helicopter's service record and accident reports prepared by Norwegian authorities cannot be obtained by mandatory process outside the United States pursuant to the district court's authority under rules 37 and 45 of the Federal Rules of Civil Procedure.[56] Likewise, the attendance of Norwegian witnesses at trial cannot be compelled pursuant to the district court's authority under rule 45(f) to declare the witness to be in contempt of court.[57]

In this respect, UTC's dilemma is identical to its situation as defendant in *Dahl v. United Technologies Corporation*, 632 F.2d 1027,[58] a recent Third Circuit case raising nearly identical legal questions in a very similar factual context.[59] On the question of relative ease of access to sources of proof, the district court in *Dahl* found:

> No evidence relevant to the claims asserted by the plaintiffs is located in Delaware. These actions arose out of a crash of a Norwegian owned and operated helicopter in the territorial waters of Norway. The recovered parts of the wreckage are located in Norway. The helicop-

ter was based and maintained in Norway and its maintenance, flight and operational records are located there. The Norwegian Civil Aviation Administration is currently conducting an investigation into the probable cause of the accident.

> In addition to the demonstrative and documentary evidence just mentioned, a substantial amount of the testimonial evidence will come from Norwegians. Testimony from persons who know the decedents will be relevant to the damages issue. Among the potential liability witnesses are employees of Helikopter Service A/S, employees from other firms in Norway that serviced or made installations on the helicopter, and the Norwegian government officials who investigated the accident. *UTC could not compel the attendance of these Norwegian witnesses at trial in Delaware. Nor could it compel production here of any real or documentary evidence in Norway.*[60]

As in *Dahl*, plaintiffs here contend that the sources of proof they require are in the United States—primarily records concerning the design, manufacture, inspection and testing of the helicopter—and that consequently they would have greater access to sources of proof relevant to *their* theories of

---

selves risk summary judgment by insisting on litigating in the United States.

**56.** Neither Fed.R.Civ.P. 37 (providing discovery sanctions) nor Fed.R.Civ.P. 45(f) (governing sanctions for failure to obey subpoenas) provide penalties if foreigners abroad fail to comply with discovery requests.

**57.** A district court's enforcement of a subpoena order against a foreign national on foreign soil would, in certain circumstances, constitute a violation of international law. *See FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300, at 1310–1322 (D.C.Cir. 1980).

**58.** 632 F.2d 1027 (3d Cir. 1980) [hereinafter *Dahl*].

**59.** *Dahl* involved a helicopter crash into the North Sea off the coast of Norway on 23 November 1977, seven months before the accident in dispute here. As in this case, the doomed helicopter was designed and manufactured by UTC and owned and operated by Helikopter. Four Norwegian citizens and residents, surviv-

ors of the decedents, filed wrongful death actions in the United States District Court for the District of Delaware in August 1978 alleging strict liability and negligence. When UTC moved to dismiss on grounds of *forum non conveniens*, the district judge granted the motion conditional on UTC's consent to personal jurisdiction in Norway, as did Judge Hart in the instant case.

On appeal, the Third Circuit panel unanimously affirmed. Judge Rosenn, writing for the court, reviewed the district court's evaluation of the *Gilbert* public and private factors and agreed that Norway was a suitable forum for the dispute. Concluding that the forum lacked sufficient nexus with the case to justify commitment of judicial time and resources to it, the Third Circuit held that the district court had not abused its discretion by renouncing jurisdiction in favor of the Norwegian courts. *Id.*

**60.** *Dahl*, 632 F.2d at 1030, *quoting* 472 F.Supp. at 700 (emphasis added by appellate court).

the case were trial to be conducted here.[61] Yet appellants concede that, even under a strict liability theory, the maintenance records which UTC seeks to obtain would be relevant to the issue of proximate cause.[62] Furthermore, there can be little dispute that on the issue of damages, most of the relevant information—for example, the financial loss suffered by the plaintiffs as a result of the alleged wrongful deaths— would be found abroad.[63] Thus, so long as trial were to be conducted in the United States, the inability of both parties to obtain the full panoply of relevant Norwegian evidence would greatly hinder fair resolution of the dispute.

We recognize, of course, that some of the necessary documents and testimony could be obtained from abroad through the channels of international judicial assistance which have been negotiated in conjunction with the Federal Rules of Civil Procedure.[64] While these mechanisms exist, however, they are far from perfect. If trial were to be conducted here, significant procedural obstacles might limit the availability of foreign discovery to the parties. The Hague Convention on the Taking of Evidence Abroad [65] to which the United States, France, Norway, and Great Britain are all signatories [66] specifies that when a party fails to secure a witness' voluntary cooperation by notice or commission procedure,[67] it may seek discovery via a letter rogatory—a letter of request from an American judge for the assistance of a foreign judicial authority. Although the Hague Evidence Convention provides a mechanism whereby the recipient nation's executing authority is required to assist an American court with such compulsory force as its own courts can exercise in a pretrial evidentiary situation,[68] numerous exceptions to

**61.** Brief of Appellants at 55; Reply Brief of Appellants at 11. *Cf. Dahl*, 632 F.2d at 1030.

**62.** Brief of Appellants at 60; Reply Brief of Appellants at 11.

**63.** *See* Brief on behalf of Appellee at 15; J.A. at 20a–21a.

**64.** The Federal Rules of Civil Procedure provide for the taking of deposition evidence abroad in a manner stipulated in writing by the parties, Fed.R.Civ.P. 29; on notice before a person authorized to administer oaths at the place of the examination, either under a local law or American law, Fed.R.Civ.P. 28(b)(1); or before a person specially commissioned by the court to administer the oath, Fed.R.Civ.P. 28(b)(2). *See* 4 Moore's Federal Practice (2d ed.1979) ¶ ¶ 28.03–04, .06.

Depositions from unwilling witnesses may be taken pursuant to the provision in Fed.R.Civ.P. 28(b)(3) authorizing the issuance of letters rogatory. Although the cooperation of the deponent is ensured by local courts acting upon letters rogatory, execution of the letters in the first case rests upon principles of international comity, and is in that sense discretionary. *See* 4 Moore's Federal Practice, *supra*, ¶ 28.05.

**65.** Under the Multilateral Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, *done* 18 March 1970 [1972] 23 U.S.T. 2555, T.I.A.S. No. 7444 [hereinafter Hague Evidence Convention], which was in turn built on the framework established by the Multilateral Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, *done* 15 November 1965, [1969] 20 U.S.T. 361, T.I.A.S. No. 6638, 658 U.N.T.S., papers may be served, interrogatories propounded, and other documents necessary for the prosecution of a trial obtained from one contracting nation by another. For a more detailed description of procedures under the Hague Evidence Convention, *see* Note, *Taking Evidence Outside of the United States*, 55 B.U. L.Rev. 368, 381–85 (1975).

**66.** 23 U.S.T. at 2576–77. The Hague Evidence Convention is presently in force among Cyprus, Czechoslovakia, Denmark, Finland, France, Germany, Gibraltar, Israel, Luxembourg, Norway, Portugal, Singapore, Sweden, the United Kingdom, and the United States. 7 Martindale-Hubbell Law Directory 4509–18 (1980).

**67.** The Hague Evidence Convention employs a tripartite division of methods of obtaining evidence abroad: *notice* to appear before an American consulate officer or foreign officer; the designation of a private *commissioner*, or a *letter rogatory* (called in the English text of the Convention a "Letter of Request"). Each of these three methods is also described in Fed.R. Civ.P. 28(b). *See* note 64 *supra*. The notice and commission procedures are designed primarily for situations where a foreign witness will *voluntarily* cooperate in testimony or production of documents; the letter of request technique is used when there is a need to employ a foreign court's *compulsory* powers.

**68.** Article X of the Hague Evidence Convention states:

In executing a Letter of Request the requested authority shall apply the appropriate

this international obligation exist,[69] which potentially bar this device from being executed at all. For example, foreign judicial cooperation may be withheld altogether if the discovery assistance requested is deemed prejudicial to state sovereignty.[70]

Furthermore, even when discovery abroad is available, the *breadth* of evidence ordinarily expected from a full-fledged American-style deposition might be con-

stricted for any number of reasons: [71] the foreign state's own procedures might limit or foreclose cross-examination, full participation of counsel might not be allowed, or a verbatim record might not result, thus limiting admissibility of the testimony in an American court.[72] The scope of foreign privilege might prove broader under the letter rogatory procedure than under either local law or American law,[73] and in some

measures of compulsion in the instances and to the same extent as are provided by its internal law for the execution of orders issued by the authorities of its own country or of requests made by parties in internal proceedings.

69. Article XII(b) of the Convention, for example, specifies that execution of a Letter of Request may be refused if "the State addressed considers that its sovereignty or security would be prejudiced thereby."

Article XXIII of the Convention further states that any contracting state may "declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries." This reservation, inserted at the request of the United Kingdom, has been made by every contracting state except the United States. *See* Report on the Work of the Special Commission on the Operation of the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, *reprinted in* 17 I.L.M. 1425, 1427 (1978).

70. Hague Evidence Convention, art. XII(b), *cited in full*, note 69 *supra*.

71. *See e. g.*, Borel & Boyd, *Opportunities for and Obstacles to Obtaining Evidence for Use in Litigation in the United States: In France*, 13 Int'l Law 35, 40–41 (1979) [hereinafter Borel & Boyd]:

A French judge [supervising discovery] may . . . resort only to those enforcement measures provided by the French Code of Civil Procedure, which are somewhat more limited than comparable provisions under American law. A French judge may order a party or a nonparty to disclose and produce any and all written documents held by such party. A daily fine for noncompliance may accompany the judge's order. The judge may also order the personal appearance of the parties. *But if they refuse to appear, no legal sanctions such as a fine or imprisonment may be applied to them.* The judge may only draw an adverse inference in appropriate situations from the failure to produce evidence which a party would normally be presumed to possess.

Thus, sanctions do exist under French law, but they are considerably more limited than the sanctions provided by Rule 37 of the Federal Rules of Civil Procedure in cases of a failure to make discovery.
(emphasis added).

72. Because in many civil law countries only the foreign state's procedures are available to a requesting judge, a letter rogatory will often be propounded by a magistrate's examination in the foreign language according to the written questions framed by the letter, without active participation of counsel and without verbatim record. *See* Carter, *Obtaining Foreign Discovery and Evidence for Use in Litigation in the United States: Existing Rules and Procedures*, 13 Int'l Law 5, 15 (1979). *See also* Borel & Boyd, *supra* note 71, at 36–37:

[In France] the judge alone has the right to summon the parties or non-party witnesses to give oral evidence and to take official note of their testimony. Such testimony is never transcribed verbatim; only a written summary is prepared. Each of the parties and their counsel may request the judge to summon additional parties, witnesses or experts, but a French judge is not bound to accede to such requests, and there is no right of appeal from an adverse decision. . . .
For the most part . . . the parties and their counsel are silent spectators, allowed to speak only when they are requested or authorized to do so by the judge.

73. Article XI of the Hague Evidence Convention states: "a Contracting State may declare that, in addition, it will respect privileges and duties existing under the law of States other than the State of origin and the State of execution, to the extent specified in that declaration." Thus, a foreign nation may by Article XI extend to a witness a type of personal privilege customarily unavailable in either that state *or* the state of the requesting court. A frequently cited example is the French privilege under which a doctor of medicine is said to be forbidden to make any disclosure about his patients, including even their names. *See* Report of the United States Delegation to Eleventh Session of the Hague Conference on Private International Law, *reprinted in* 8 I.L.M. 785, 811–12 (1969).

cases, official translators might be required for each piece of paper involved.[74] Regardless of whether or not foreign evidence would be as fully available were trial to be conducted here, there can be little doubt that the cost to the litigants of employing such procedures would be exceedingly high.[75]

Were trial to occur abroad, the only issue subject to proof would be the issue of damages. The evidence found in the United States regarding plaintiffs' strict liability theory would not therefore be required by the foreign tribunal since the liability issue would already have been resolved in plaintiffs' favor. Since most of the witnesses who could testify concerning the health and future earning capacity of decedents would presumably be most amenable to compulsory process in the countries where decedents resided, the ease of access to sources of proof would still favor suit abroad rather than in the United States, even if a number of trials were conducted in different countries. Thus regardless of *where* trial might be held, the balance of inconveniences on the issue of relative ease of access to sources of proof would weigh heavily in favor of dismissal to a foreign forum.

### 2. *Inability to Implead Third-Party Defendant*

The second major factor of private interest militating in favor of dismissal in this case is UTC's inability to implead the third-party defendant (Helikopter) in a liability action in this country. Joinder of Helikopter is crucial to the presentation of UTC's

defense in this country, for if it could be shown that the accident was caused not by any defect in design or manufacture of the aircraft but by negligent maintenance or operation of the aircraft, UTC would be relieved of liability altogether. In *Fitzgerald v. Texaco, Inc.*,[76] the Second Circuit noted that: "The inability to implead other parties *directly involved* in the controversy is a factor which weighs against the retention of jurisdiction ..."

We acknowledge that UTC, if found liable in a United States court, would still be able to press a right of indemnification against Helikopter in the courts of Norway. Three considerations convince us that UTC would nevertheless remain prejudiced by suit here. First, UTC would still be severely hampered in the presentation of its defense in *this* case by the inability to join Helikopter as a party. Second, judicial resources would be conserved if all liability were affixed in one suit, and total relief granted in one action. While it is conceivable that several foreign trials might result from the district court's conditional dismissal orders,[77] these would be limited to the issue of damages and would thus likely prove less complex than one trial here on the question of liability, followed by a second trial abroad on the indemnification issue. Third, foreign courts might place a limit on the amount that UTC could recover against Helikopter in a separate proceeding brought abroad, thus preventing UTC from obtaining full recovery-back of any amount awarded against it in litigation in this country.[78] This consequence would place UTC

---

74. Under Article XXXIII of the Hague Evidence Convention a state which has reserved the right to "exclude" English from letters rogatory need not honor the requesting court's desire that the letter rogatory be executed in English. *See also* art. IV. All non-English speaking states among whom the Convention is presently in force have declared this reservation. 7 Martindale-Hubbell Law Directory 4512–17 (1980).

75. The myriad practical problems and expenses involved in taking evidence abroad are recounted in Doyle, *Taking Evidence By Deposition and Letters Rogatory and Obtaining Documents in Foreign Territory*, ABA Section of Int'l & Comp.L., Proceedings 37, 46–49 (1959)

(discussing problems with interpreters, court reporters, witnesses and local counsel abroad).

76. 521 F.2d 448, 453 (2d Cir. 1975), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976) (emphasis added).

77. *Kahn v. United Technologies Corp.*, No. 78–2035 (D.D.C. 29 Mar. 1979), *reprinted in* J.A. at 8a–11a.

78. A foreign court might impose such a limit because of public policy considerations, its own statutory law, or international agreement. For example, under the Warsaw Convention, offi-

at a significant disadvantage if the litigation were to be conducted here. Clearly, the inability of the district court to accord full relief suggests that it is inferior to a forum which might possess jurisdiction over *all* significant parties to the dispute.

■ It is true, of course, that defendant has agreed to submit to the jurisdiction of potentially four separate foreign countries and that none of the conditional dismissals requires plaintiffs to sue in any particular forum. Thus, dismissal of the liability action in *this* country does not necessarily guarantee that the damages issue will be tried in a consolidated forum with all interested parties present or that all problems of securing evidence will be eliminated. While these points are not easily ignored, neither do they affect our view of the inappropriateness of *this* forum as the locus for this particular litigation.[79] As we suggest be-

low, the central question which a court must answer when weighing the *public* interests in the outcome and administration of a case such as this is whether the case has a general nexus with the forum sufficient to justify the forum's commitment of judicial time and resources to it. Our reexamination of these public interests below suggests that no such nexus exists.

## B. *Factors of Public Interest*

■ Three principles may be derived from the list of public interest factors enunciated in *Gilbert*[80]: first, that courts may validly protect their dockets from cases which arise within their jurisdiction, but which lack significant connection to it;[81] second, that courts may legitimately encourage trial of controversies in the localities in which they arise;[82] and third, that a court may validly consider its familiarity

cially known as the Convention For the Unification of Certain Rules Relating to International Carriage by Air, 12 Oct. 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11 (1934), and subsequent international agreements such as the Hague Conference of 1955 and the Montreal Agreement of 1966, liability limits have been placed upon passenger recovery against international air carriers. *See generally* Lowenfeld & Mendelsohn, *The United States and the Warsaw Convention*, 80 Harv.L.Rev. 497 (1967). For a discussion of the uncertainties created by the Warsaw Convention's liability limits, *see* Sheinfeld, *From Warsaw to Tenerife: A Chronological Analysis of the Liability Limitations Imposed Pursuant to the Warsaw Convention*, 45 J.Air L. & Comm. 653 (1980).

Furthermore, UTC's claim for indemnification might not be fully enforceable against the third-party defendant overseas. This issue caused considerable problems in the interpretation of the Common Market Preliminary Draft Convention on the Recognition and Enforcement of Judgments, now found in CCH Common Market Reporter ¶6003 (1978), which sought to create a binding multilateral convention regulating recognition of civil and commercial judgments among all of the Common Market nations. *See* Hay, *The Common Market Preliminary Draft Convention on the Recognition and Enforcement of Judgments—Some Considerations of Policy and Interpretation*, 16 Am.J.Comp.L. 149, 155–56 (1968).

79. Whatever the eventual result in this case, there would still be no certainty that all of the

actions could be resolved in a single lawsuit. A related set of wrongful death actions arising out of the accident which is the subject matter of the suit here is now pending disposition of a motion to dismiss on *forum non conveniens* grounds in the Southern District of New York. *See Eleanor Fiacco, et al. v. United Technologies Corp.*, No. 78–3583, S.D.N.Y., *filed* 4 Aug. 1978.

A motion to consolidate the New York and Washington, D.C., actions for coordinated discovery was made to the Judicial Panel on Multidistrict Litigation on 17 November 1978, but was withdrawn five days later as premature.

80. *See* text accompanying note 30 *supra*.

81. *See, e. g.*, Barrett, *supra* note 25, at 404:

As the doctrine [of *forum non conveniens*] has developed in American courts emphasis has been placed primarily on inconvenience to the court as the principal reason for refusing jurisdiction. As early as 1848 a federal court in declining to hear an admiralty suit between British subjects said: "... it would be lamentable if courts were compelled to defer the business of the citizens of the country to bestow their time on litigations between parties owing no allegiance to its laws, and contributing in no way to its support." citing *One Hundred & Ninety-Four Shawls*, Fed.Cas.No.10,521 at 705 (S.D.N.Y.1848).

82. *See Gilbert* at 509, 67 S.Ct. at 843 ("There is a local interest in having localized controversies decided at home.")

with governing law [83] when deciding whether or not to retain jurisdiction over a case. Thus, even when the private conveniences of the litigants are nearly in balance, a trial court has discretion to grant *forum non conveniens* dismissal upon finding that retention of jurisdiction would be unduly burdensome to the community, that there is little or no public interest in the dispute, or that foreign law will predominate if jurisdiction is retained. In dismissing the action, Judge Hart emphasized the first and the third of these factors.[84] We find that all three militate in favor of dismissal.

### 1. Burden on the Community

Perhaps the most striking feature of this case is the lack of *any* significant contacts between the event in dispute and the forum chosen by the plaintiffs in which to litigate the consequences of that event. The accident giving rise to the litigation occurred within the territorial waters claimed by Norway.[85] The aircraft was owned and operated by Helikopter, a Norwegian corporation [86] which does no business in the United States. The aircraft was maintained by Helikopter in Norway since the date of its delivery from the United States.[87] The wreckage, service records, and maintenance records for the aircraft are located in Norway.[88] When the crash occurred, the aircraft was on a flight from Norwegian soil

to an oil rig in the North Sea.[89] The flight crew resided in Norway, and the records pertaining to their training and qualifications are located in Norway.[90] The Norwegian Civil Aviation Administration conducted an official investigation of the accident, and the records of that investigation are located in Norway.[91] All but one of the plaintiffs—the mother of the decedent Kahn—reside outside the United States.[92]

Thus, virtually all significant contacts link this controversy with Norway, not Washington, D.C. Indeed this controversy has only two contacts with the United States: the residence of the decedent Kahn's mother in New Hampshire,[93] and the helicopter's manufacture in Connecticut years ago.[94] Since this controversy has no relation whatever to the forum chosen by the plaintiffs—the District of Columbia—the district judge was entirely justified in dismissing the case. As the trial judge quite properly determined,[95] jury duty for this matter ought not be imposed upon the people of the District of Columbia, nor should local dockets be clogged by appeals in this case.[96]

### 2. Local Public Interest in the Dispute

In our view, the same factors which render this matter burdensome to the District of Columbia strongly suggest as well the absence of *local* public interest in the dis-

---

**83.** "There is an appropriateness ... in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." *Id.*

**84.** *See* J.A. at 49a.

**85.** *See* page 4 *supra.*

**86.** *See* note 4 *supra* and accompanying text.

**87.** *See* Brief on behalf of Appellee at 4.

**88.** *See* note 7 *supra* and accompanying text.

**89.** *See* page 4 *supra.*

**90.** *See* note 7 *supra* and accompanying text.

**91.** *See* notes 6–7 *supra* and accompanying text.

**92.** *See* note 11 *supra* and accompanying text.

**93.** *Id.*

**94.** The accident helicopter, a Sikorsky S–61N model, was designed, manufactured, assembled, inspected and tested at the Sikorsky plant in Connecticut. J.A. at 2a, 16a.

**95.** J.A. at 49a.

**96.** *Cf. Gilbert* at 508, 67 S.Ct. at 843 (administrative difficulties follow when litigation is piled up in congested courts instead of being handled at its origin). At the hearing, Judge Hart commented on "the infinite number of administrative cases" in our Court of Appeals. J.A. at 49a.

pute. Nor do we believe that the nation as a whole has a *general* interest in resolving this matter locally. Upon reflection, we agree with Judge Rosenn's observation for the Third Circuit in *Dahl* that this factor cannot warrant reversal of a *forum non conveniens* dismissal:

> The last public factor raised is a general national interest in the case. The plaintiffs vigorously assert that the United States has a vested interest in the outcome of this suit, for all aircraft that are manufactured for sale here must be certified by the federal government. In effect, the integrity of the aircraft certification process may be put in issue which justifies retention of an American forum. However, UTC points out that Norway has an equal interest in applying its Aviation Act and products liability law to this case. UTC argues that the Norwegian Aviation Act was passed, in part, due to concern in Norway over accidents occurring within its borders and over its territorial waters. Thus, Norway's interest in the case is equal if not superior to the United States' and the national interest factor does not shift the balance in favor of Delaware as the forum.[97]

Of course we cannot force the plaintiffs here to seek relief in Norway, the most interested forum. But neither is it clear that the District of Columbia would offer a better forum for vindicating the United States' "general national interest" in the dispute than another forum within the United States, for example, Connecticut or New Hampshire.[98] We see no reason why retention of jurisdiction is compelled in the District of Columbia when it is apparent that this forum is one of the least convenient forums imaginable.

**97.** *Dahl*, 632 F.2d at 1032.

**98.** *See* text accompanying notes 93–94 *supra.*

**99.** J.A. at 48a.

**100.** Brief of Appellants at 50–55; Reply Brief of Appellants at 14–16.

**101.** We express no opinion as to the governing law at this time. However, when, as here, a

### 3. *Applicability of Local Law*

The district court concluded at the hearing that Norwegian law would likely govern resolution of the substantive dispute in this case, both as to liability and "certainly as to damages,"[99] since Norway is the place where the tort occurred, and hence the jurisdiction with the most substantial interest in the dispute. Appellants argue that interest analysis would require application of federal law, or alternatively, the law of Connecticut, the place of the helicopter's manufacture.[100] A cursory analysis of the district court's conflicts analysis persuades us that it did not err in treating applicable substantive law as a public factor favoring dismissal.[101] Again, we find the Third Circuit's reasoning in *Dahl* particularly apposite:

> We have reviewed the district court's conflicts of laws analysis and we cannot say that the court erred in concluding that the factor of applicable substantive law favored dismissal of the actions. We believe that Norwegian substantive law will predominate the trial of this case and that the mere presence of a count pleaded under Connecticut law but which may have little chance of success does not warrant a different conclusion. *If we were to hold otherwise, the plaintiff could avoid dismissal on* forum non conveniens *grounds by the inclusion of a substantive count based on American law regardless of the merits of that claim.*[102]

We are fully aware of the possibility that defendant here may in fact be engaging in a subtle form of "reverse forum-shopping." UTC is willing to go to trial on the issue of damages alone because of its apparent conviction that recovery overseas would yield substantially less than recovery

strong possibility exists that foreign law will be applied, *Gilbert* persuades us that the trial court has discretion to weigh into the *forum non conveniens* determination the consideration that problems will inherently arise when a court is forced to apply a law with which it is unfamiliar. 330 U.S. at 509, 67 S.Ct. at 843.

**102.** *Dahl*, 632 F.2d at 1032 (emphasis added).

here.[103] Clearly, the doctrine of *forum non conveniens* was never intended to accommodate such a result, nor should the limited potential liability abroad ever be a factor weighing *in favor* of defendant on a motion to dismiss for *forum non conveniens*.

To this concern, however, we can suggest three answers. First, even if UTC's motive in seeking to litigate abroad is less than noble, its decision to do so is not costless. When a plaintiff chooses a forum, he not only runs the risk of low recovery, but also the risk of losing on the liability issue. As a practical matter, even assuming that recovery awards obtainable in foreign jurisdictions may not be as high as those likely to be obtained in the United States, the potential tradeoff involved in this case hardly appears unreasonable: under the district court's conditional dismissal order appellants are freed of the substantial costs of conducting a trial in the United States

on the issue of liability as well as the risk of obtaining absolutely no recovery at all.

Second, even if the potential amount of recovery has affected defendant's decision to seek trial elsewhere, the comparative amount of recovery obtainable in the two alternative forums has never been considered a factor relevant to the *forum non conveniens* inquiry.[104] In almost every *forum non conveniens* decision the substantive law of one forum potentially favors one litigant over the other.[105] Choice of the applicable substantive law will almost inevitably affect the amount of recovery; thus, an entire body of conflicts-of-law principles has evolved to aid courts making such choices. When a court engages in a *forum non conveniens* analysis, however, its central concern is furthering the just, speedy and inexpensive determination of the action.[106] The *Gilbert* factors are intended to reflect those "*practical problems that make trial of a case easy,*

---

**103.** The parties' assumption here is that if the case is tried in the United States, the controlling law—at least with respect to damages—will be American and not Norwegian. Both the American and the Norwegian law that might govern these cases appear to provide for "fair and just compensation for the pecuniary loss sustained." *See* 46 U.S.C. § 762 (1976); Brief for Appellee at 26. The appellants assume, however, that recovery in a Norwegian court would be significantly reduced by the absence of a "collateral source" rule in Norwegian law. In other words, the recovery under Norwegian law arguably may be *reduced* by the amount of any insurance, pension, or social security payments received by the plaintiffs.

Though we express no opinion on these points, we note that there has been no suggestion in this case that the choice between the different measures of damages urged by the parties turns on anything but choice of law considerations. The plaintiffs' desire to litigate in the United States is presumably motivated by their belief that an American court is more likely to apply the American measure of damages, which in this case is allegedly the more generous.

**104.** Most of the courts who have even addressed the problem have found that the prospect of a smaller recovery under foreign law does not prohibit dismissal from American courts. *See, e. g., Canada Malting Co. v. Paterson S.S., Ltd.*, 285 U.S. 413, 52 S.Ct. 413, 76 L.Ed. 837 (1932); *Alcoa en banc, supra* note 32, at 5971; *Fitzgerald v. Texaco, Inc.*, 521 F.2d

448, 453 (2d Cir. 1975), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976); *Koupetoris v. Konkar Intrepid Corp.*, 535 F.2d 1392, 1397 n.22 (2d Cir. 1976); *Kloeckner Reederei und Kohlenhandel v. A/S Hakedal*, 210 F.2d 754, 757 (2d Cir.), *cert. dismissed*, 348 U.S. 801, 75 S.Ct. 17, 99 L.Ed. 633 (1954).

**105.** Indeed, the search for the forum with the most advantageous governing law lies at the very heart of the notion of forum-shopping. *Cf. Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) (discussing the choice between state and federal law in federal diversity cases).

**106.** *See, e. g.*, the *forum non conveniens* provision of the Uniform Interstate and International Procedure Act, drafted by the Columbia Law School Project on International Procedure, in collaboration with the Advisory Committee to the Commission on International Rules of Judicial Procedure, text and comments *reprinted in* 11 Am.J.Comp.L. 417 (1962). Section 1.05 of the Act authorizes unrestricted application of the doctrine of *forum non conveniens* when statutory requirements for the exercise of personal jurisdiction are satisfied but other factors indicate that the forum is inconvenient:

When the court finds that in the interest of substantial justice the action should be heard in another forum, the court may stay or dismiss the action in whole or in part on any conditions that may be just.

expeditious and inexpensive",[107] not the factors such as choice of governing law which affect the substantive disposition of the case. This is not a case in which defendant's attempt to limit recovery was the sole or primary consideration before the district court. The lower court therefore, was not only error-free, but affirmatively correct in declining to consider relative amount of recovery in making its balancing inquiry.

Finally, even assuming that the defendant here disingenuously moved for dismissal, we believe that the district court was better placed than we to make such an assessment. Judge Hart made his discretionary disposition based upon live testimony and argument of counsel. To reverse on this ground would unfairly substitute our judgment for the reasoned exercise of discretion by the district judge.[108]

## V. THE WEIGHT TO BE ACCORDED PLAINTIFFS' CITIZENSHIP AND RESIDENCE IN THE BALANCE OF CONVENIENCES

The appellants urge that the trial judge should have given more weight to the citizenship and residence of the parties in deciding this motion.[109] In effect they suggest that the Gilbert-Koster presumption in favor of plaintiffs' chosen forum should be accorded particularly great weight when plaintiffs are American citizens or residents. Stated alternatively, appellants suggest that when plaintiffs are American residents or citizens, defendants must prove a higher degree of private inconvenience, "harassment," or "vexation" by plaintiffs in order to win forum non conveniens dismissal.

This argument has been stated in a number of federal courts in a number of different ways. In recent years some federal courts have explicitly held[110] or strongly implied[111] that when United States citizens bring actions in federal courts, such actions may not be dismissed on forum non conveniens grounds where such dismissal would force an American plaintiff to litigate his claim in the courts of a foreign country, unless the defendant can meet a higher standard of proof on plaintiff's intent to harass than Gilbert and Koster normally require.[112] In addition, the Norwegian and the French appellants here claim to be beneficiaries of treaty rights entitling them to be treated as American citizens whose forum choice deserves extra deference. Because the United States has signed treaties of trade, or of friendship and cooperation, with many nations guaranteeing equal access of one nation's citizens to courts of the other,[113] these foreign appellants argue that

107. Gilbert, 330 U.S. at 508, 67 S.Ct. at 843 (emphasis added).

108. See Restatement (Second), Conflict of Laws 2d § 84, comment b. (1971):
 Discretion of trial judge. Whether a suit should be entertained or dismissed under the rule of [forum non conveniens] depends largely upon the facts of the particular case and is in the sound discretion of the trial judge.

109. Brief of Appellants at 32–38.

110. Alcoa S. S. Co. v. M/V Nordic Regent, No. 78–7054 (2d Cir. 10 Jan. 1979), rev'd en banc (25 Feb. 1980).

111. See, e. g., Founding Church of Scientology v. Verlag, 536 F.2d 429, 435 (D.C.Cir.1976) (greater showing of inconvenience required to deprive American plaintiff, in contrast with a foreign plaintiff, of an American forum); Olympic Corp. v. Societe Generale, 462 F.2d 376, 378 (2d Cir. 1972) (same); Hoffman v. Goverman, 420 F.2d 423, 426–27 (3d Cir. 1970) (same); Burt v. Isthmus Dev. Co., 218 F.2d 353, 357 (5th Cir.), cert. denied, 349 U.S. 922, 75 S.Ct. 661, 99 L.Ed. 1254 (1955).
 For a discussion of these issues, see generally Note, Forum Non Conveniens and American Plaintiffs in the Federal Courts, 47 U.Chi.L.Rev. 373 (1980) [hereinafter Chicago Note]; The Proper Role of the Residence Factor in Forum Non Conveniens Motions, 45 S.Cal.L.Rev. 249 (1972) (discussing state forum non conveniens dismissals).

112. See Part III supra.

113. Although the wording of these treaties varies, the equal-access-to-courts provisions within them have generally been accorded full weight by American courts. See Alcoa en banc, supra note 32, slip op. at 5955–57; Farmanfarmaian v. Gulf Oil Corp., 588 F.2d 880, 882 (2d Cir. 1978). See generally Wilson, Access-to-Courts Provisions in United States Commercial Treaties, 47 Am.J.Int'l L. 20 (1953).

defendants here should carry an especially heavy burden of inconvenience before the suits may be dismissed.

Under existing case law it is at least arguable that the citizenship or residence of American plaintiff or the comparable treaty rights of the foreign plaintiffs are factors which should either tip the balance of private conveniences against dismissal or, which alternatively should strengthen the presumptive weight usually accorded to plaintiffs' choice of forum under *Gilbert* and *Koster.* Federal courts sitting in admiralty have traditionally taken the citizenship of the parties into account when deciding *forum non conveniens* motions.[114] Where both parties are foreigners, courts have usually not hesitated to exercise their discretion to decline jurisdiction.[115] Where all plaintiffs are American citizens, by contrast, courts have demonstrated historical reluctance to dismiss where the alternative is litigation in a foreign forum.[116] Furthermore, the question concerning the exact weight to be given factors of citizenship and residence in the application of the *forum non conveniens* doctrine has been explicitly left open by the Supreme Court in *Swift & Co. Packers v. Compania Colombiana Del Caribe.*[117]

■ We are not convinced, however, that plaintiffs' forum choice here deserves extra weight in the "balance of private conveniences" simply because several of the plaintiffs are American citizens or because one of the plaintiffs is an American resi-

dent. We reach this conclusion both because of recent trends in the federal courts and because of the peculiar facts in this case.

In the recent case of *Alcoa Steamship Co., Inc. v. M/V Nordic Regent,*[118] the Second Circuit sitting *en banc* rejected the notion that American citizens should be accorded preferential access to courts in the United States.[119] The effect of the decision in *Alcoa* is to require an application of the *forum non conveniens* doctrine strictly pursuant to the tests set forth in *Gilbert* and *Koster,* without regard to the citizenship of the parties. Although this approach differs somewhat from the approach previously followed by this court in *Founding Church of Scientology v. Verlag,*[120] we find the Second Circuit's *en banc* reasoning in *Alcoa* persuasive. As Judge Timbers observed, writing for the *en banc* panel in *Alcoa,* "the trend of both the common law generally and admiralty law in particular has been away from according a talismanic significance to the citizenship or residence of the parties." [121] In modern times there appears to be no good answer to the question posed by Chief Judge Feinberg in *Schertenleib v. Traum* : [122] "If litigation is in a clearly inconvenient forum, why should defendant and the court be burdened with its continuing there, if an alternative forum now exists so that plaintiff will not be without a remedy?"

Federal courts have recently begun to acknowledge [123] that judicial unwillingness

---

114. *See* Bickel, *supra* note 25, at 19–41.

115. *See The Belgenland,* 114 U.S. 355, 363 (1885).

116. *See, e. g., Founding Church of Scientology v. Verlag,* 536 F.2d 429, 435–36 (D.C.Cir.1976); *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326, 1344 (2d Cir. 1972).

117. In *Swift,* the Court noted that:
[t]he doctrine [of *forum non conveniens* ] is of long standing in admiralty, but this Court has not previously had to apply it to a suit brought by a United States citizen. Such application has been rare even in the lower federal courts. . . . We need not now decide the abstract question whether United States

admiralty courts may decline jurisdiction over libels brought by United States citizens. 339 U.S. 684, 697, 70 S.Ct. 861, 869, 94 L.Ed. 1206 (1950) (citations omitted).

118. *Alcoa en banc, supra* note 32.

119. *Id.* at 5960–69.

120. 536 F.2d 429 (D.C.Cir.1976).

121. *Alcoa en banc, supra* note 32, at 5960.

122. 589 F.2d 1156, 1163 (2d Cir. 1978).

123. *See, e. g., Mizokami Bros. v. Baychem Corp.,* 556 F.2d 975 (9th Cir. 1977) (per curiam), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 770, 54 L.Ed.2d 783 (1978) (*forum non conveniens*

to dismiss actions to competent courts abroad on grounds of citizenship alone may merely reflect an unthinking orientation overly protective of American plaintiffs—even those who reside abroad—and "insufficiently sensitive to the ability of foreign courts to perform their adjudicatory functions fully as well as do the courts of the United States." [124] More than fifteen years ago, Judge Ginsburg commented on the undesirable consequences of the reluctance of our courts to force American domiciliaries to litigate abroad by withholding a domestic forum:

> Such reluctance deters revision or repeal of internationally undesirable rules of competence .... [T]he *forum non conveniens* doctrine appears to offer the most promising currently feasible remedy for cases commenced in a "competent" but clearly inappropriate forum. [125]

 The fact that a number of the plaintiffs here hold American citizenship—usually in the form of dual citizenship acquired through inheritance [126]—seems peculiarly inapposite to the question whether special presumptive weight should be accorded their choice of forum. Upon examination the factor of American citizenship

*per se* proves largely *irrelevant* to the factors which *Gilbert-Koster* required courts to consider when making *forum non conveniens* determinations. [127] At best, citizenship serves as an inadequate proxy for the American *residence* of plaintiff, which in turn is only one indicator of how *inconvenient* it may be for the plaintiff to litigate his case in a foreign forum, as measured by the *Gilbert* factors of private interest. [128] As one commentator recently observed:

> [I]t is undoubtedly true that American citizens, taken as a class, tend to possess characteristics that make foreign litigation inconvenient for them. It is entirely proper that such characteristics be weighed in a court's balancing of the parties' inconveniences. But American citizenship, as such, correlates imperfectly with those characteristics, and therefore should not be used as a facile proxy for plaintiff's convenience. [129]

 Nor do we find the fact that one of the plaintiffs here is an American *resident* to be in any way dispositive. There is some suggestion in the record that that plaintiff may have been made a party precisely to defeat dismissal on *forum non conveniens* grounds. [130] Federal courts have long treat-

---

dismissal upheld despite plaintiff's United States citizenship). *See also Mohr v. Allen*, 407 F.Supp. 483 (S.D.N.Y.1976) (American citizen plaintiff's suit dismissed to Mexico when Mexico was clear locus of events).

124. Recent Developments, *Federal Courts: Forum Non Conveniens*, 20 Harv.Int'l L.J. 404, 412 (1979) (discussing Second Circuit's panel decision in *Alcoa*) [hereinafter Harvard Note].

125. *See* Ginsburg, *supra* note 40, at 99–100.

126. Although decedent Kahn's children are allegedly American citizens, they hold their American citizenship solely through their deceased father. *See* Brief on behalf of Appellee at 3; J.A. at 1a–2a.

127. *Cf.* text accompanying notes 29–30 *supra*.

128. *Cf.* text accompanying note 29 *supra*.

129. Chicago Note, *supra* note 111, at 382–83.

130. Two Norwegian newspaper articles reproduced in the Joint Appendix, J.A. at 62a–66a, indicate that plaintiffs' counsel here is "the largest American law firm which is specializing

in lawsuits from aviation accidents." J.A. at 66a. One of the articles notes:

> A representative of the American law firm Speiser, Krause, and Modale [sic] has again been in Norway. The law firm has previously had attorneys in this country to investigate in connection with the case the firm is pleading for the French widow who claims 25 million Kroner in compensation from the Sikorsky Manufacturers. The attorney has now also been in contact with a Norwegian widow. He states to Aftenposten that there is nothing preventing the Norwegian widows after the accident to receive the same compensation as the French woman.

J.A. at 62a (citing "Norwegian widow sues the Sikorsky manufacturers," *Aftenposten* 8 August 1978 (translation from the Norwegian)). The second article observes:

> Stewart Speiser [sic] is in Norway together with another attorney from Speiser, Krause & Madola [sic], in order to familiarize himself with the circumstances surrounding the accident prior to the suit against the Sikorsky manufacturer. On behalf of the widow of a Frenchman who died in the accident, Speiser, Krause & Madola [sic] are claiming 25 mil-

ed motions for *forum non conveniens* dismissal differently depending upon whether the United States plaintiffs suing American defendants are plaintiffs suing in their own right [131] or are so-called "nominal plaintiffs," suing as subrogees,[132] assignees,[133] or representatives [134] of foreign companies. In the latter case, courts have generally refused to give special deference to the domestic forum choice of a nominally American plaintiff.[135] Indeed, in *Mohr v. Allen* [136] the Southern District of New York held in the alternative that *forum non conveniens* dismissal to Mexico of a suit brought by an American citizen would have been warranted even without an unusually strong showing of inconvenience to the defendant when the plaintiff had in fact been domiciled in Mexico for fourteen years.[137]

 Thus, despite the fact that the trial court did not explicitly recognize the presumption in favor of plaintiffs' choice of forum, we do not find that such omission amounted to an abuse of discretion *in this case*. Just as alien plaintiffs ought not expect to resist a *forum non conveniens* dismissal against nonresident defendants simply by establishing residence in the United States immediately prior to initiating suit,[138] plaintiffs here cannot expect the court to defer automatically to their forum choice merely because one of their number is an American resident. Even federal courts denying dismissals on the grounds of *forum non conveniens* have always been careful to point out that American citizens and residents have no indefeasible right of access to the federal courts.[139] To permit such a right of access would effectively leave "both the defendant and the court essentially helpless in the face of a plaintiff's decision to bring an action in a forum which clearly is not the most appropriate

lion Kroner in compensation from the manufacturer of the Sikorsky helicopters.

. . . . .

So far, only the French widow, Jaqueline Pain [sic] and her three children have engaged the American law firm which are specialists on liability suits from aviation accidents.

["] I am not disregarding that there might be others. However, we will not contact the survivors of Norwegians who died. In that case, they will have to approach us with their lawyers, ["] says Stewart Speiser.
J.A. at 65a (citing "Lawyers in USA considering suit against Helikopter Service," *Arbeiderbladet* 20 July 1978 (translation from the Norwegian).).

Given this background, the inclusion of Naomi Kahn, the only American resident, as a plaintiff can arguably be interpreted as an attempt by plaintiffs' counsel to gain the benefits of an American forum for a lawsuit purely foreign in its original impetus.

**131.** *See, e. g., Burt v. Isthmus Dev. Co.,* 218 F.2d 353, 357 (5th Cir.), *cert. denied* 349 U.S. 922, 75 S.Ct. 661, 99 L.Ed. 1254 (1955); *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir. 1972); *Bersch v. Drexel Firestone, Inc.,* 389 F.Supp. 446 (S.D.N.Y.1974), *aff'd in part, rev'd in part,* 519 F.2d 974 (2d Cir. 1975), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975).

**132.** *See, e. g., United States Merchants' & Shippers' Ins. Co. v. A/S Den Norske Afrika Og Australie Line,* 65 F.Supp. 392, 394 (2d Cir. 1933).

**133.** *Del Monte Corp. v. Everett S. S. Corp.,* 402 F.Supp. 237, 243 (N.D.Cal.1973).

**134.** *Fitzgerald v. Westland Marine Corp.,* 369 F.2d 499, 502 (2d Cir. 1966).

**135.** For a discussion of such cases *see generally* Note, *The Convenient Forum Abroad,* 20 Stan.L.Rev. 57, 68–71 (1967); Note, *The Convenient Forum Abroad Revisited: A Decade of Development of the Doctrine of Forum Non Conveniens in International Litigation in the Federal Courts,* 17 Va.J.Int'l L. 755, 780 (1977) ("Traditionally, a defendant's [*forum non conveniens*] motion could succeed when the U. S. plaintiff was suing not in his own right but rather derivatively on behalf of an alien interested.").

**136.** 407 F.Supp. 483 (S.D.N.Y.1976). *See also Mizokami Bros. v. Baychem Corp.,* 556 F.2d 975, 978 (9th Cir. 1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 770, 54 L.Ed.2d 783 (1978).

**137.** 407 F.Supp. 483, 488 (S.D.N.Y.1976).

**138.** *See, e. g., Papageorgiou v. Lloyds of London,* 436 F.Supp. 701, 703 (E.D.Pa.1977); *Bielefeld v. Walleniusrederierna,* (1977) Am.Mar. Cas. 119, 120–21 (S.D.N.Y.1976).

**139.** *See, e. g., Vanity Fair Mills v. T. Eaton Co.,* 234 F.2d 633, 645 (2d Cir.), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956) ("An American citizen does not have an absolute right under all circumstances to sue in an American court").

one to hear the case." [140] We need not decide today what the proper outcome of a case similar to this would be if *all* plaintiffs were American citizens or residents; [141] suffice it to say that on the facts presented here, plaintiffs have not established that any *special* weight should have been accorded to their choice of forum. The doctrine of *forum non conveniens* is designed to preserve the discretion of the trial court as to exercise of jurisdiction. It should not therefore be transmuted into a device overly protective of the discretion of *plaintiffs* to sue in inconvenient forums when all other private and public factors clearly favor dismissal.

## VI. CONCLUSION

We find that the district court properly evaluated and applied the standards relevant to determining a *forum non conveniens* motion. The inconveniences and burdens to both the parties and the public of conducting a fair trial in the United States overwhelmed the *Gilbert-Koster* presumption favoring plaintiff's choice of forum.

For the reasons stated above, we hold the district court's order

*Affirmed.*

---

140. Harvard Note, *supra* note 124, at 412.

141. Here the Christophersen, Kahn and Frantzen plaintiffs reside in Norway; the Pain plaintiffs reside in France; the Sibthorpe plaintiffs reside in Great Britain. Only Naomi Kahn resides in the United States. Brief on behalf of Appellee at 3.