652 F.2d 1032
 209 U.S.App.D.C. 235
 Catherine M. DONAHUE, Executrix of Frances A. Cehon,
deceased, and Sidney H. Cehon, Sr., Executor of
the Estate of Richard P. Cehon,
deceased, Appellants,
v.
FAR EASTERN AIR TRANSPORT CORPORATION a/k/a Yuan Tung
Aeronautic Company.
Catherine M. DONAHUE, Executrix of Frances A. Cehon,
deceased, and Sidney H. Cehon, Sr., Executor of
the Estate of Richard P. Cehon, deceased,
v.
FAR EASTERN AIR TRANSPORT CORPORATION a/k/a Yuan Tung
Aeronautic Company, Appellant.
 Nos. 80-1243, 80-1472.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 23, 1981.
Decided April 22, 1981.
 
 Marc S. Moller, New York City, for appellant in No. 80-1243 and appellee in No. 80-1472.
 Geoffry D. C. Best, New York City, for appellee in No. 80-1243 and cross-appellant in No. 80-1472.
 Before ROBB, WILKEY and GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge GINSBURG.
 GINSBURG, Circuit Judge:
 
 
 1
 Two United States citizens, Frances A. and Richard P. Cehon, lost their lives at Taipei International Airport on July 31, 1975, while on holiday in Taiwan. The Cehons, parents of two young children, were Connecticut domiciliaries, temporarily residing in Guam. They had purchased tickets in Taiwan for an intra-island flight. The couple departed from Hualien, a city on Taiwan, aboard a British-made Viscount, owned and operated by a Taiwan company, Far Eastern Air Transport Corporation (F.E.A.T.). At the terminus of the journey in Taipei, the plane crashed in an attempted landing during a heavy rainstorm. We are called upon to determine whether F.E.A.T. is subject to suit in a United States forum for the alleged wrongful death of the Cehons.
 
 
 2
 Asserting negligence in the operation, maintenance, and control of the aircraft, the Cehons' executors commenced identical actions against F.E.A.T. in five U. S. district courts: the District of Guam, the District of Hawaii, the Central District of California, the Southern District of New York, and the District of Columbia. Pursuant to 28 U.S.C. § 1407 (1976), the Judicial Panel on Multidistrict Litigation, on June 30, 1977, ordered all five actions consolidated for pretrial proceedings in the District of Columbia. In re Air Crash Disaster at Taipei International Airport on July 31, 1975, 433 F.Supp. 1120 (Jud.Pan.Mult.Lit., 1977).
 
 
 3
 Following the transfer and consolidation, F.E.A.T. moved to dismiss, under Fed.R.Civ.P. 12(b)(2), for lack of personal jurisdiction. At plaintiffs' request, the district court deferred decision on the motion to dismiss pending discovery limited to the jurisdiction issue. Donahue v. F.E.A.T., Misc. No. 77-0147 (D.D.C. Nov. 1, 1977). One year later, in a memorandum opinion filed November 16, 1978, the court granted the motion to dismiss in its entirety. It concluded that F.E.A.T. lacked contacts with any of the five forums sufficiently "substantial and continuous" to make it fair to subject the airline to suit on claims unrelated to the demonstrated United States contacts. The next year, in response to plaintiffs' motion for reconsideration, the district court adhered to its initial ruling regarding Guam, Hawaii, New York, and the District of Columbia. However, based on an augmented presentation of California connections, it determined that the litigation should proceed there. Donahue v. F.E.A.T., Misc. No. 77-0147 (D.D.C. Dec. 18, 1979).
 
 
 4
 After district court certification pursuant to 28 U.S.C. § 1292(b) (1976), this court authorized an interlocutory appeal from the ruling that F.E.A.T. was answerable in California for the Taipei crash.[1] Before us now are: (1) plaintiffs' appeal from the order granting F.E.A.T.'s motion to dismiss with respect to the actions commenced in Guam, Hawaii, New York, and the District of Columbia; and (2) F.E.A.T.'s appeal from the denial of its motion with respect to California. We conclude that the motion to dismiss should have been granted with respect to all five actions.
 
 
 5
 Plaintiffs and, to a more limited extent, the district court have confounded specific jurisdiction to adjudicate claims linked to activities occurring or having an impact in the forum state, and general, "all purpose" adjudicatory authority to hear and decide claims totally unconnected with the forum. See Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors, 647 F.2d 200, at 203 n.5 (D.C.Cir.1981). F.E.A.T.'s California connections would permit litigation against it there on claims relating to ventures it pursued in that state. Those connections, however, are not "so substantial and of such a nature"[2] as to warrant haling F.E.A.T. to California to answer for activity it pursues entirely within Taiwan.
 
 
 6
 I. F.E.A.T.'S APPEAL: THE CALIFORNIA CONNECTIONS
 
 
 7
 In its initial November 1978 ruling, the district court pointed to three F.E.A.T.-California connections: (1) F.E.A.T. purchased spare airplane parts from United States companies in several states and paid for them from a San Francisco Citibank account;[3] (2) after the crash that took the lives of the Cehons but before commencement of this litigation, F.E.A.T. applied to the Civil Aeronautics Board, in December 1975, to initiate a Taipei-Los Angeles cargo charter service; (3) anticipating inauguration of the cargo service, F.E.A.T. negotiated for the purchase of two Boeing 737 aircraft from United Airlines, and consummated the over $7 million purchase in May 1977. These activities, the district court pointed out, bore no relationship to the Taipei accident. They were insufficient, the court determined, to require F.E.A.T. to defend a lawsuit in California seeking recovery for the estate and survivors of the United States citizens killed in the crash.[4]
 
 
 8
 The augmented presentation that led the district court to reach an opposite conclusion in December 1979 related to F.E.A.T.'s anticipated California-Taiwan cargo service. The Civil Aeronautics Board had granted permission for thrice-weekly cargo flights from Taiwan to Los Angeles and San Francisco via Hawaii and Guam; F.E.A.T. sent approximately 44 employees to California for six weeks of training in the operation and maintenance of the Boeing aircraft; F.E.A.T. retained a freight forwarding agent in California to arrange for transshipment of airplane parts for repair purposes;[5] the planned cargo service was announced in the World Aviation Directory, a publication circulated throughout the United States. In addition to these contacts, enumerated in the district court's December 1979 memorandum, plaintiffs call our attention to further aspects of the cargo venture. Among these additional contacts, plaintiffs feature the following items: a "managing agent" of F.E.A.T. "temporarily resided" in California to facilitate arrangements for the purchase of aircraft and the planned cargo service; the Boeing planes F.E.A.T. purchased to carry cargo were to be serviced in California pursuant to a repair, overhaul, and maintenance agreement with United Air Lines; F.E.A.T. contemplated acquisition in the United States of additional aircraft, it anticipated opening offices in Los Angeles and Honolulu staffed by a total of six people, and it forecast a 1976 profit of $1.5 million from Taiwan-United States transportation of approximately 95,550 tons of freight.
 
 
 9
 The planned cargo service did not get off the ground. After this litigation commenced, F.E.A.T. halted the proposed operation on advice of counsel. Counsel's advice was rendered in view of F.E.A.T.'s potential exposure to jurisdiction in the United States in the wrongful death actions plaintiffs had instituted. It is undisputed that the cargo service was not inaugurated and that F.E.A.T. has derived no revenue from the projected venture. Nonetheless, the district court reasoned that the activity had gone far enough to qualify California as a permissible forum for adjudication of the claims in suit. The court noted F.E.A.T.'s characterization of the cargo venture contacts "as tentative or preliminary business activities," but stated that "they clearly constitute the initial phase of a major business enterprise." J.A. 318. The magnitude of the F.E.A.T.-California connections relating to the planned cargo enterprise, the district court concluded, made it fair and reasonable for the Cehons' executors to call F.E.A.T. to account in California for the tragic termination of the July 31, 1975, intra-Taiwan flight.
 
 
 10
 Plaintiffs have invoked federal court subject matter competence on the basis of the parties' diversity of citizenship. No claim arising under federal law figures in the litigation. Personal jurisdiction over F.E.A.T. in these circumstances turns on state law. See Arrowsmith v. United Press International, 320 F.2d 219 (2d Cir. 1963) (en banc); Ramamurti v. Rolls-Royce Ltd., 454 F.Supp. 407 (D.D.C.1978), aff'd mem., 612 F.2d 587 (D.C.Cir.1980); 4 C. Wright & A. Miller, Federal Practice and Procedure § 1075, at 309-10 & n.50 (1969). The relevant state law provision, California Code of Civil Procedure § 410.10 (West 1973), telescopes state and federal limitations on the state's assertion of personal jurisdiction: the section permits the exercise of personal jurisdiction "on any basis not inconsistent with the Constitution ... of the United States." We therefore turn to the question whether this litigation may go forward in California without violating constitutional due process constraints on a state's assertion of personal jurisdiction over an alien corporation.
 
 
 11
 Our inquiry is guided by recent Supreme Court decisions elaborating upon Chief Justice Stone's benchmark opinion in International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), particularly, Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), Rush v. Savchuk, 444 U.S. 320, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980), and World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). While none of these decisions dealt with jurisdictional objections of foreign country (as distinguished from sister state) defendants, the Supreme Court's reasoning appears a fortiori applicable to a defendant such as F.E.A.T., a Taiwan company operating primarily in Taiwan with no subsidiaries, branches, or offices in the United States.
 
 
 12
 International Shoe held that states may authorize their courts to exercise personal jurisdiction over nonresidents if the out-of-state defendant has "certain minimum contacts with (the state) such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " 326 U.S. at 316, 66 S.Ct. at 158 (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)). Attempting to give specific content to the "fair play and substantial justice" formulation, Chief Justice Stone catalogued cases involving out-of-state corporations. First, where the corporation's in-state activity was "continuous and systematic" and that activity gave rise to the episode in suit, personal jurisdiction unquestionably could be asserted. 326 U.S. at 317, 66 S.Ct. at 159. International Shoe itself ranked in that category. Further, the commission of "some single or occasional acts" in a state might be sufficient to render the corporation liable to suit in the state with respect to those acts, though not with respect to matters totally unrelated to the forum connections. 326 U.S. at 318, 66 S.Ct. at 159. These categories, sometimes described by the label "specific jurisdiction," have comprised the area in which the most significant development has occurred since International Shoe.[6] "Long-arm" statutes and rules reflect that development.
 
 
 13
 The case at hand falls in neither of the "specific jurisdiction" categories just described, since F.E.A.T.'s activity in California did not give rise to the Taipei incident for which recovery is sought. On the facts presented an intra-island flight on a domestic Taiwan airline, tickets purchased in Taiwan no United States forum could exercise "specific jurisdiction." International Shoe, however, included further entries in its illustrative catalogue. Chief Justice Stone referred to "continuous corporate operations within a state ... so substantial and of such a nature as to justify suit against (the out-of-state corporation) on causes of action arising from dealings entirely distinct from those activities." 326 U.S. at 318, 66 S.Ct. at 159. Plaintiffs urge that F.E.A.T.'s activities in California fit this description. F.E.A.T., on the other hand, would categorize this case as one in which a corporation's "continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity." 326 U.S. at 318, 66 S.Ct. at 159. In contrast to specific jurisdiction in a lawsuit involving forum-connected claims, general jurisdiction to adjudicate claims unconnected with the forum is at stake here.[7]
 
 
 14
 The textbook case of general jurisdiction appropriately exercised over a foreign corporation that has not consented to suit in the forum is Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). Defendant was a Philippine corporation and its mining operations were centered in the Philippines. During World War II, however, the company's operations were halted and suit in the Philippines was not possible because of the Japanese occupation. Ohio, at the time the lawsuit commenced, appeared to have more sustained connections with the company than any other forum open to the plaintiff. The Supreme Court held that due process limitations would not be transgressed if an Ohio state court entertained a suit against the mining company brought by a nonresident of Ohio on a claim that had arisen outside the state.
 
 
 15
 Plaintiffs concede that this case is readily distinguished from Perkins. There, the mining company's president and general manager "carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company." 342 U.S. at 448, 72 S.Ct. at 419. F.E.A.T., beyond question, is centered and managed in Taiwan and has never had surrogate headquarters or an office of any kind in the United States. Plaintiffs must therefore rely on what F.E.A.T. planned, and what it might have done in the United States "but for" this litigation.
 
 
 16
 We rule that, on the facts before us, F.E.A.T.'s links with California must be evaluated on the basis of the situation existing at the time litigation commenced. At that time no "major business enterprise" had been inaugurated, no substantial operations were ongoing, no revenue was derived from business generated in California or, indeed, any place in the United States. Prospective activity, plans, and forecasts do not suffice to supply the solid hold a state should have before it exercises general jurisdiction over an outsider.
 
 
 17
 We need not speculate whether a different approach would be warranted had F.E.A.T. carried out its plan to establish the cargo operation. We add, however, that even if the venture had blossomed prior to the filing of the wrongful death actions, we would entertain a doubt whether the existence of freight operations unrelated to F.E.A.T.'s wholly intra-Taiwan passenger service would do to "make it reasonable" to require F.E.A.T. to defend this particular litigation in California. International Shoe, 326 U.S. at 317, 66 S.Ct. at 158. See Aanestad v. Beech Aircraft Corp., 521 F.2d 1298, 1301 (9th Cir.), cert. denied, 419 U.S. 998, 95 S.Ct. 313, 42 L.Ed.2d 272 (1974); cf. Bulova Watch Co. v. K. Hattori & Co., 508 F.Supp. 1322, 1344 (E.D.N.Y.1981) (in practice, courts do weigh relationship of local activities to claim alleged in the complaint in determining whether general jurisdiction may be predicated on the foreign corporation's "doing business" within the state). Not only is the episode in litigation foreign to California. In addition, the Cehon family had no special affiliation no domicile or residence linking the decedents or their survivors to the forum community. Cf. Aanestad v. Beech Aircraft Corp.
 
 
 18
 In Shaffer v. Heitner, the Supreme Court indicated that the proper approach is not simply to count up a defendant's connections with a state and to determine whether those affiliations, "considered by themselves, had some minimum quantitative dimension or purposiveness." Restatement (Second) of Judgments, Reporter's Note at 67 (Tent. Draft No. 5, 1978).[8] "Rather, the question of territorial jurisdiction is to be resolved by reference to the convenient administration of justice in all its aspects, including alternative forums (and) the plaintiff's connection with the forum state ...." Id. at 67-68. In this case, California has no relationship whatever with the accident, the plaintiffs, or the beneficiaries plaintiffs represent. The natural forum for the litigation, Taiwan, is open to plaintiffs, although recovery prospects there may make resort to that jurisdiction unattractive to plaintiffs. Cf. Pain v. United Technologies Corp., 637 F.2d 775, 793-94 & nn.103 & 104 (D.C.Cir.1980). The California connections plaintiffs list, if they are not "considered by themselves," but in relation to this litigation, cannot be regarded as adequate to support assertion of personal jurisdiction over F.E.A.T.
 
 
 19
 Finally, we note the the Supreme Court's reminder in World-Wide Volkswagen that the due process check on state assertions of personal jurisdiction, commanded under International Shoe's minimum contacts analysis, serves two purposes: (1) it ensures fairness to the defendant ("the defendant's conduct and connection with the forum State (must be) such that he should reasonably anticipate being haled into court there"); and (2) it prevents states from encroaching upon each other's sovereignty. See 444 U.S. at 291-93, 297, 100 S.Ct. at 564-65, 567. We have already expressed our view that the first, or "fairness" component of the due process check cannot be met on the basis of any business F.E.A.T. regularly conducted in California. The projected cargo venture did not progress far enough to yield business benefits to the Taiwan corporation; the operation was a prospect, not a reality. As to the second purpose, a foreign land's sovereignty is surely no less worthy of consideration than that of a sister state. Taiwan's interest in providing a forum for this litigation is evident an event within its borders gave rise to the controversy and it is the place in which F.E.A.T.'s activities are centered. No similar sovereign interest can be attributed to California or the United States. Cf. Pain v. United Technologies Corp., 637 F.2dat 793 (relevance of foreign nation's interest to forum non conveniens determination).
 
 
 20
 II. THE APPEAL OF THE CEHONS' EXECUTORS: GUAM, HAWAII, NEW
 
 YORK, AND DISTRICT OF COLUMBIA CONNECTIONS
 
 21
 F.E.A.T.'s links with California were more substantial than its connections with the other forums in which plaintiffs instituted wrongful death actions. Therefore, the issues raised by the appeal of the Cehons' Executors do not warrant elaborate discussion.
 
 
 22
 As to Guam, the Cehons' temporary place of residence and an indicated stopover in F.E.A.T.'s unrealized cargo service venture; Hawaii, another indicated cargo service stopover and a place where F.E.A.T. might have set up an office staffed by a few people; and the District of Columbia, where the Civil Aeronautics Board is located,[9] plaintiffs rely on appeal solely upon a theory of "aggregated contacts" with the United States as a whole. Plaintiffs' counsel conceded at oral argument that the proffered theory, which has attracted only limited support in federal question cases,[10] appears to have made no mark at all in cases that do not arise under federal law.
 
 
 23
 With respect to New York, plaintiffs assert that the "doing business" test of New York C.P.L.R. § 301 (McKinney 1972) is met on the basis of F.E.A.T.'s large borrowings from the First National City Bank. Apart from the question of the extent to which the loans were arranged by Citibank's Taiwan office, we find no support for the argument that New York has authorized its courts to proceed against a foreign country corporation on a claim arising in a foreign land when the sole tie to New York is a series of bank loans. Cf. Fosen v. United Technologies Corp., 484 F.Supp. 490, 500-01 (S.D.N.Y.1980).[11]
 
 III. CONCLUSION
 
 24
 We fully understand why the plaintiffs here seek a United States forum for adjudication of the wrongful death claims they wish to assert. The Taiwan legal system is unfamiliar to them and, even if they establish serious fault on the part of F.E.A.T., they cannot reasonably anticipate United States style damages abroad.[12] Long ago, a celebrated British jurist observed that Tobago cannot rule the world by commanding outsiders to appear before its courts whenever an insider seeks relief there.[13] In that respect, the United States is similarly inhibited, and the restraint is self-imposed.[14] We conclude that it is incompatible with due process to require F.E.A.T., a company headquartered in Taiwan, operating principally at home, and lacking any substantial base in the United States, to respond in this country for the deaths of United States citizens on a domestic inter-city flight booked and boarded in Taiwan.
 
 
 25
 For the reasons stated above we rule that the motion to dismiss should be granted in its entirety. Accordingly, we affirm the judgment of the district court to the extent that it grants F.E.A.T.'s motion to dismiss the actions instituted in federal courts in Guam, Hawaii, New York, and the District of Columbia; we reverse the judgment to the extent that it denies the motion to dismiss the action instituted in the District Court for the Central District of California, and we instruct the district court, on remand, to grant the motion to dismiss that action.
 
 
 26
 Affirmed in part, reversed in part, and remanded.
 
 
 
 [1]
 F.E.A.T. v. Donahue, No. 80-8004 (D.C.Cir. Apr. 28, 1980). 28 U.S.C. § 1292(b) vests discretion in the court of appeals to permit an appeal from an interlocutory order when the district court certifies "that (the) order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal ... may materially advance the ultimate termination of the litigation."
 
 
 [2]
 International Shoe Co. v. Washington, 326 U.S. 310, 318, 66 S.Ct. 154, 159, 90 L.Ed. 95 (1945)
 
 
 [3]
 Plaintiffs note that F.E.A.T. also purchased two helicopters with Citibank financing
 The Citibank branch in question is an "Edge Act Bank," established under federal legislation originally enacted in 1919, 12 U.S.C. §§ 611-632 (1976 & Supp. III 1979), to promote sale abroad of United States products. Such banks deal almost exclusively in international business. They may engage in domestic transactions only to the extent that such transactions are incidental to their international business. Id. § 616 (1976).
 
 
 [4]
 The district court observed that post-accident contacts "could not serve to give the defendant notice that it might be subject to a forum's jurisdiction." J.A. (Joint Appendix) 172. Cf. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980) (due process constraint "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit")
 
 
 [5]
 Plaintiffs and the district court described the freight forwarder as F.E.A.T.'s "import-export shipping agent." The record, however, indicates only an arrangement to transship airplane parts for repair. J.A. 227
 
 
 [6]
 See generally von Mehren & Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv.L.Rev. 1121 (1966)
 
 
 [7]
 See id. at 1141-44, 1177. In some cases, the reality of a defendant's multistate or multinational operation requires recognition of an overlap in the generally serviceable "specific" and "general" jurisdiction categories. See Bulova Watch Co. v. K. Hattori & Co., 508 F.Supp. 1322, 1328-29 (E.D.N.Y.1981)
 
 
 [8]
 That method of evaluation, however, is pressed by the plaintiffs and appears to have been adopted by the district court
 
 
 [9]
 Dealings with the federal government, standing alone, do not provide a basis for District of Columbia exercise of personal jurisdiction over a nonresident on the invitation of a private party. See Environmental Research International, Inc. v. Lockwood Greene Engineers, Inc., 355 A.2d 808, 813 (D.C.App.1976) (en banc)
 
 
 [10]
 See von Mehren & Trautman, supra note 6, 79 Harv.L.Rev. at 1124 n.6; cf. Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors 647 F.2d at 204-205
 
 
 [11]
 In the case on which plaintiffs rely, McCrory Corp. v. Cloth World, Inc., 378 F.Supp. 322 (S.D.N.Y.1974), the court found, on the submission made, that the injury in suit occurred in New York. Cf. Bryant v. Finnish National Airlines, 15 N.Y.2d 426, 208 N.E.2d 439, 260 N.Y.S.2d 625 (1965) (airline had public relations office in New York; plaintiff was a New Yorker)
 
 
 [12]
 Even if suit were maintained in the United States, plaintiffs would encounter a formidable choice of law obstacle in avoiding application of Taiwan rules governing liability and amount recoverable. See Tramontana v. S.A. Empresa De Viacao Aerea Rio Grandense, 350 F.2d 468 (D.C.Cir.1965) (Brazilian limit on wrongful death damages, then approximately $170, applicable to death of Maryland resident on intra-Brazil flight on Brazilian domestic air line). Accord, Ciprari v. Servicos Aereos Cruzeiro, S.A., 245 F.Supp. 819 (S.D.N.Y.1965), aff'd, 359 F.2d 855 (2d Cir. 1966). We note too that the litigation instituted by plaintiffs, even if a personal jurisdiction impediment did not bar the way, might be vulnerable to dismissal on forum non conveniens grounds. See Pain v. United Technologies Corp., at 795-799 (a plaintiff's United States citizenship does not preclude forum non conveniens dismissal in favor of forum abroad)
 
 
 [13]
 Buchanan v. Rucker, 9 East 192, 194, 103 Eng.Rep. 546, 547 (K.B. 1808) (Ellenborough, C. J.) ("Can the island of Tobago pass a law to bind the rights of the whole world? Would the world submit to such an assumed jurisdiction?")
 
 
 [14]
 Apart from the constitutional restraint, it might disserve economic interests of state and nation to condition an alien's purchasing of goods or services or borrowing money from United States enterprises upon submission to jurisdiction on claims unrelated to the purchases or loans. The exorbitant, caveat emptor rule plaintiffs' argument suggests appears unfair, internationally undesirable, and out of touch with concerns larger than the instant litigation