**TRANSAMERICAN STEAMSHIP
CORPORATION, Plaintiff,**

v.

**SOMALI DEMOCRATIC REPUBLIC
and Somali Shipping Agency,
Defendants.**

**Civ. A. No. 82–2043.**

United States District Court,
District of Columbia.

July 23, 1984.

Reuben B. Robertson, Hydeman, Mason, Burzio & Lloyd, Washington, D.C., for plaintiff.

Daniel J. O'Callaghan, Delson & Gordon, New York City, for defendants.

## MEMORANDUM

JOHN LEWIS SMITH, Jr., District Judge.

Plaintiff Transamerican Steamship Corporation brings this action for declaratory and monetary relief against defendants Somali Democratic Republic ("SDR") and Somali Shipping Agency ("SSA"). Currently before the Court are defendants' motion to dismiss for lack of subject-matter jurisdiction, lack of personal jurisdiction, and *forum non conveniens*.

This litigation stems from the parties' participation in a July 1981 shipment of grain from the United States to Somalia. In March 1981, pursuant to the Agricultural Trade and Development Act of 1954, 7 U.S.C. § 1691 *et seq.* ("P.L. 480"), the Agency for International Development ("AID") and the SDR entered in an assistance agreement whereby the United States would provide approximately 5000 tons of yellow corn to Somalia.[1] Under the pro-

---

1. P.L. 480 provides for two types of agricultural assistance programs. Under Title I, the United States agrees to finance *purchases* of agricultural products by foreign governments. *See* 7 U.S.C. § 1701, 1715; *Ministry of Supply, Cairo v. Universe Tankships, Inc,* 708 F.2d 80, 84 (2d Cir.1983). Under Title II, the program involved here, the United States *donates* agricultural commodities to foreign states, voluntary agencies, or intergovernmental organizations, to "meet famine or other urgent or extraordinary relief requirements." 7 U.S.C. § 1721. The Act authorizes the Commodity Credit Corporation to pay "costs and charges" associated with a gift,

gram, the United States, through the Department of Agriculture's Commodity Credit Corporation ("CCC"), would arrange and pay for shipment of the grain. On May 5, 1981, plaintiff executed a cargo booking confirmation, providing that plaintiff would transport the corn from Houston, Texas, to Kismayu, Somalia. On June 5, 1981, plaintiff issued an ocean bill of lading upon receipt of the corn on its vessel, the M/V Klaus Leonhardt, at Houston. Plaintiff contacted defendant SSA, a Somali governmental agency responsible for operation of Somali ports, to make necessary arrangements regarding berthing and discharge of the cargo. On July 22, 1981, plaintiff made an advance payment demanded by the SSA for "pro forma disbursements," and discharge of the cargo commenced in Kismayu.

At this point the problems began. Plaintiff alleges that its vessel "was ready to sail from Kismayu on July 26, 1981, but defendants ... wrongfully detained plaintiff's vessel until August 3, 1981." Amended Complaint ¶¶ 21, 25. Plaintiff further alleges that defendants "demanded that plaintiff pay an additional $28, 312.30 in U.S. funds to the Embassy of the [SDR] in Washington, D.C. in order to obtain the release of its vessel from Kismayu." *Id.* at ¶ 22. Because "detention of the vessel was costing plaintiff at least $10,000 for each day of delay under its time charter party with the vessel's owners," plaintiff made the payment "in accordance with the Embassy's directions." *Id.* at ¶ 25. Plaintiff's efforts to recover detention damages and other claims against defendants through diplomatic means were unsuccessful, and plaintiff filed this suit on July 22, 1982.

Defendants contend that both the SDR and SSA are immune from suit and therefore the Court lacks subject-matter jurisdiction; that neither defendant has sufficient "contacts" with the United States to satisfy due process limitations on the exercise of personal jurisdiction; and that, in any event, the case should be dismissed under the *forum non conveniens* doctrine. Upon consideration, the Court concludes that the case should be dismissed as to the SDR, but may go forward against the SSA.

1. *Somali Democratic Republic: Subject-Matter Jurisdiction*

Disposition of the SDR's Rule 12(b)(1) motion turns upon an application of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1330 *et seq.* Under the Act, a federal district court has subject-matter jurisdiction in civil actions against "foreign states" whenever the state is "not entitled to immunity" under the Act or international agreement. *Id.* at § 1330. Foreign states are immune from suit except as provided in §§ 1605–07; the exceptions pertinent in this case are found in § 1605:

"(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

(1) in which the foreign state has waived its immunity either explicitly or by implication....

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or

(3) upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere;

including "ocean freight charges from United States ports to designated ports of entry abroad." *Id.* at § 1723.

Detailed regulations governing the transfer of commodities under Title II are found at 22 C.F.R. Part 211 ("Regulation 11"). Under Section 211.3(a), the "cooperating sponsor," including a foreign government recipient, must enter into an agreement with AID that incorporates "by reference or otherwise the terms and conditions set forth in" Regulation 11. Defendant

SDR entered into such an agreement. Section 211.4 describes the mechanics of shipment, and subsection (e) requires that "applicable ocean bills of lading" be forwarded to the consignee whenever the CCC handles shipping arrangements. Of particular interest here—indeed, at the heart of plaintiff's claim—is Section 211.-17(a): "the *cooperating sponsor* shall be responsible for all costs for ... (2) for *demurrage, detention,* and overtime." (emphasis supplied).

(4) or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."[2]

Plaintiff contends that the SDR is not immune by virtue of both the commercial activity and waiver exceptions. The Court, however, concludes that defendant's conduct does not fall within the sweep of either § 1605(a)(1) or (2), and therefore its motion to dismiss must be granted.

### A. *Commercial Activity*

■ Resolution of a § 1605(a)(2) case requires a three-part inquiry: 1) identifying the relevant conduct; 2) determining whether that conduct consists of or is related to "commercial activity;" and 3) whether that commercial activity "bears the relation to the cause of action and to the United States described by one of the three phrases of § 1605(a)(2)." *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 308 (2d Cir.1981), *cert. denied* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). Courts devote substantial and often exasperated attention to understanding the "three phrases of § 1605(a)(2)", *see, e.g., Vencedora Oceanica Navigacion v. C.N.A.N.,* 730 F.2d 195, 199–204 (5th Cir.1984), but an unusually explicit legislative history contributes to easier application of the statute in this factual setting.

Plaintiff finds jurisdictional significance in essentially two sets of events involving the SDR. First, plaintiff argues that the SDR engaged in commercial or commercially-related acts in the United States by signing the transfer authorization and by "acquiring legal ownership" of the grain before shipment. *See* Plt.Opp.Mo.Dis. at 22. Second and more importantly, plaintiff suggests that the SDR became "directly involved" in the conceded commercial activity of the SSA "by acting as the SSA's designated agent to collect funds demanded from plaintiff as a condition for releasing the ship." *Id.* at 14. Plaintiff points to the SDR's role in accepting and retaining the July and August 1981 payments at its Washington bank, and to its personnel's participation in meetings with plaintiff. In sum, plaintiff argues, the SDR was "at least as involved" as the SSA in "commercial activities." *Id.*

In evaluating the SSA's conduct, it is important to recall that the Act distinguishes between commercial activity "carried on in the United States" (clause 1), and "acts" or "effects" in the United States connected with a "commercial act of the foreign state elsewhere" (clauses 2, 3). *Cf. Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1112 (S.D.N.Y.1982). There is no question that the SSA engaged in commercial activity elsewhere, but there are no such allegations about the SDR.[3]

---

**2.** Section 1603 defines "commercial activity:"

"(d) A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

"(e) A 'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such state and having substantial contact with the United States."

**3.** The Act also distinguishes between "foreign states" and "agencies and instrumentalities of a foreign state" (*e.g.,* the SSA), but accords independent, sovereign status to both. *See* 28 U.S.C. § 1603; *cf. First National City Bank v. Banco Para el Comercio,* 462 U.S. 611, 103 S.Ct. 2591,

2600, 77 L.Ed.2d 46 (1983). Section 1603 suggests that jurisdiction over multiple foreign state defendants must be determined independently. Consequently, there is no *immediate* jurisdictional significance to the obvious organizational and transactional links between the SSA and the SDR.

Courts, however, do not ignore the reality of "joint conduct" when making the jurisdictional inquiry. *See, e.g., Gilson v. Republic of Ireland,* 682 F.2d 1022, 1029–30 (D.C.Cir.1982) (finding "an unbroken chain of events" linking four defendants). The Court of Appeals found agency law principles useful in determining whether a foreign state had, within the meaning of clause 1 of § 1605(a)(2), "carried on [business] in the United States": "in appropriate circumstances the activities of another may be attributed to the foreign state for purposes of the commercial activity exception." *Maritime Int'l Nominees v.*

Consequently, the only basis for § 1605(a)(2) jurisdiction is found in clause 1, and the only question is whether the SDR's conduct in the United States constitutes "commercial activity" within the meaning of the Act.

The Act's definition of commercial activity (28 U.S.C. 1603, *supra* note 2) is deliberately vague, *see Texas Trading, supra,* 647 F.2d at 308–09 (citing H.R.Rep. No. 94–1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604); but the ambiguity of the statutory language is, in this instance, cured by the specificity of the legislative history. In its analysis of § 1603, the House Report reads in part:

"By contrast, a foreign state's mere participation in a foreign assistance program administered by the Agency for International Development (AID) is an activity whose essential nature is public or governmental, and it would not itself constitute a commercial activity. By the same token, a foreign state's activities in and 'contacts' with the United States resulting from or necessitated by participation in such a program would not in themselves constitute a sufficient commercial nexus with the United States so as to give rise to jurisdiction (see sec. 1330) or to assets which could be subjected to attachment or execution with re-

spect to unrelated commercial transactions (see sec. 1610(b)). However, a transaction to obtain goods or services from private parties would not lose its otherwise commercial character because it was entered into in connection with an AID program." *Id.* at 6615.

■ This passage forecloses plaintiff's first jurisdictional theory. Execution of the transfer authorization merely documents the SDR's "participation in a foreign assistance program administered by [AID]." The same holds true with respect to the abstractions of SDR's "legal ownership" of the grain before shipment and its "authorization" of the USDA to arrange for transportation of the grain. Both are simply aspects of participation in the program.

Furthermore, the SDR's acceptance and retention of the July and August payments should not be regarded as a "sufficient commercial nexus" with the United States. That conduct obviously "resulted from" the SDR's participation in the AID program. The affidavits of both parties describe an essentially passive, "stakeholder" role on the part of the SDR. The SSA demanded that plaintiff make the additional payments to it through the SDR embassy. A defense affidavit, not refuted by plaintiff, suggests that this arrangement came about "be-

*Republic of Guinea,* 693 F.2d 1094, 1105 (D.C. Cir.1982), *cert. denied,* — U.S. —, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983). *See also Gilson v. Republic of Ireland, supra,* 682 F.2d at 1026 n. 16.

Plaintiff's "joint conduct" argument is simple: because the SDR's conduct is obviously related to the SSA's conceded commercial activities in Somalia, it was merely another link in a single (and commercial) "chain of events." Plaintiff's theory is straightforward, but its reliance on the joint-conduct cases is misplaced. First, the agency-attribution rule of *Maritime Int'l Nominees* does not operate in reverse. It is properly employed to find jurisdiction over a foreign principal (here, the SSA), and is simply irrelevant to jurisdiction over a purported U.S.-based "agent" (the SDR). Second, the broad "chain of events" and "part and parcel" language plaintiff quotes should be placed in context. Both courts were construing the "based upon" requirement of § 1605(a)(2), an issue not presented here. *See Gilson, supra,* 682 F.2d at 1027 & n. 22; *Gemini Shipping v. Foreign Trade Organization*

*for Chemicals and Foodstuffs,* 647 F.2d 317, 319 (2d Cir.1981).

Third and finally, the attribution cases reflect the dual requirements of § 1605(a)(2). In broad terms, the statute bases jurisdiction on 1) commercial activity 2) having some relation with the United States. The activity must have both "commercial" and "geographical" qualities. The joint-conduct cases invariably involve only the second prong of that test. The attribution rules—borrowed from personal jurisdiction doctrine—are invoked to find some "geographical nexus" with the United States. They are not invoked to find something "commercial" about otherwise non-commercial-but-U.S.-located conduct. The cases do not suggest that commercial activity of another party elsewhere may be attributed to a foreign state with representatives in the United States. In short, the commercial nature of the SSA's conduct cannot be transferred to the SDR. Jurisdiction over the SDR turns on whether its conduct, standing alone, comes within § 1605(a)(2).

cause of the difficulty of communicating with an entity in Somalia from the United States." Affidavit of Ahmed Sheikh Mohamed at ¶ 6 (filed October 19, 1983). *See also* Affidavit of Daniel J. O'Callaghan at ¶ 8 (filed May 22, 1984). Embassy staff did direct plaintiff to transfer the funds directly to its account at a Washington bank, and a dispute arose about the duplicate payment, but contentiousness does not amount to commercialtiy. In sum, the SDR took no affirmative action with respect to the July and August payments. It did not make any purchases, commit any torts, or receive any financing. It did not enter the marketplace in any meaningful way. *Cf. Texas Trading, supra,* 647 F.2d at 309–10. It did not engage in a "regular course of conduct or a particular commercial transaction having substantial contact with the United States."

### B. *Waiver*

Section 1605(a)(1) provides in pertinent part that a foreign state is not immune "in any case (1) in which the foreign state has waived its immunity either explicitly or by implication..." Plaintiff does not assert that the SDR "explicitly" waived its immunity; rather, plaintiff finds an implied waiver by reason of the SDR's participation in the Title II assistance program:

> "In requesting and accepting assistance from the United States, the Somali Democratic Republic executed a transfer authorization agreement in which it expressly consented to the application of the terms and conditions of AID Regulation 11. As noted earlier, Regulation 11 governs virtually all aspects of the transfer and ocean transportation of commodities to the recipient government. By thus accepting United States law, the Somali government must be deemed to have implicitly accepted the competence of the United States judicial system to enforce its provisions." Plt.Opp.Mo.Dis. at 11–12.

The threshold difficulty with plaintiff's position derives from the same legislative history discussed above. Congress expressly indicated that "mere participation in a foreign assistance program administered by [AID]" was an "essentially governmental activity" and thus not a basis for jurisdiction under the *commercial activity* exception. *See* H.R. No. 94–1487, *supra,* 1976 U.S.Code Cong. & Ad.News at 6615. The question thus is whether that participation, which of course includes acceptance of the conditions of the program, can work an implied *waiver* of immunity. Congress' expressions on the status of AID recipients under the Act surely make a finding of implied waiver much harder.

In support of its waiver argument, plaintiff relies on this passage from the House Report:

> "With respect to implicit waivers, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract." *Id.* at 6617.

Plaintiff finds evidence of the SDR's acceptance of "the laws of a particular country" in three documents: 1) the transfer authorization, which incorporates Regulation 11; 2) the cargo booking confirmation; and 3) the ocean bill of lading, which provides that it "shall be construed according to the general maritime laws of the United States." Plaintiff concludes that these documents "plainly contemplate the application of U.S. laws and the competence of U.S. courts to enforce them." Plt.Opp.Mo. Dis. at 12.

That conclusion is not so easily reached. There is, of course, no dispute that Section 211.7(c) of Regulation 11 provides that the recipient government "shall be responsible for all costs for demurrage, detention, and overtime." The regulation is silent, however, as to *whom* the recipient government is "responsible." The regulation is also silent with respect to what country's law governs any demurrage claims. For waiver purposes, there is a difference between agreeing to a particular obligation and agreeing to a particular country's law *defining* that obligation, or, more important-

ly, agreeing to a particular procedure for *resolving* disputes about that obligation. Implied waivers are found in actions and words "relating to adjudication," *Harris v. VAO Intourist, Moscow,* 481 F.Supp. 1056, 1058 (E.D.N.Y.1979), as illustrated by the numerous cases addressing the implications of arbitration agreements. *See, e.g., Maritime Int'l Nominees, supra,* 693 F.2d at 1100–04. Regulation 11 simply does not speak to procedures for resolution of demurrage claims, and cannot be deemed an acceptance by the SDR of American judicial power to resolve them.[4]

■ Furthermore, plaintiff is not even a party to the transfer authorization agreement. That document memorializes a government-to-government arrangement between the SDR and the United States, and § 211.7 may reasonably be viewed as an allocation of liability between the two governments. In any event, a "foreign state does not waive its sovereign immunity by merely entering into a contract with another nation." *Castro v. Saudi Arabia,* 510 F.Supp. 309, 312 (W.D.Tex.1980). *See also Ohntrup v. Firearms Center, Inc.,* 516 F.Supp. 1281, 1285 (E.D.Pa.1981) (agreement to arbitrate applies only to parties to agreement, not waiver as to third party). Similarly, the SDR was not a party to the cargo booking confirmation, and it is difficult at best to argue that the CCC in entering that arrangement was acting as the SDR's agent, with authority to waive immunity. Defendant seems to be correct in observing that the CCC was simply ful-

filling its role as an agency of the federal government in implementing a Title II program.

■ The only remaining basis for finding waiver is the ocean bill of lading issued by plaintiff and forwarded to a non-defendant agency of the SDR, the State Planning Commission Food Agency Department. Paragraph 8 provides that the consignee (the SDR) shall be liable for expenses occasioned by delay, and more importantly, Paragraph 15 provides that "the terms of the bill of lading shall be construed pursuant to the general maritime law of the United States." However, it is far from clear that these provisions of the bill of lading are of any effect. Paragraph 1 of the attachment to the cargo booking confirmation provides that it governs "the terms of carriage" of the shipment, notwithstanding any provisions in the on-board ocean bill of lading. Paragraph 15 indicates that the terms of the booking confirmation themselves are subject to "applicable provisions" of P.L. 480 and its regulations. Plaintiff's argument comes down to this proposition: a foreign state waives its immunity by receiving after shipment a bill of lading containing a boilerplate choice of law provision that may be without legal effect. The Court cannot find an implied waiver in this or in any of these documents. Consequently, the Court concludes that it lacks subject-matter jurisdiction over the SDR, and that the SDR's motion to dismiss must be granted.

---

**4.** It is noteworthy that Regulation 11 contains "adjudication" procedures with respect to other types of disputes arising from program activities. As noted, § 211.7 (captioned "Arrangements for entry and loading in foreign countries") and including the demurrage liability provision, does not specify how those claims are to be resolved. By contrast, § 211.9 ("Liability for loss or damage or improper distribution of commodities") establishes procedures for disputes involving claims *against* ocean carriers and "cooperating sponsors" for improper storage or distribution. *See, e.g.,* 22 C.F.R. § 211.-9(d). The bulk of the provisions deal with non-governmental cooperating sponsors, *see, e.g.,* § 211.1(a)–(2)(c), but § 211.2(e)–(g) contemplates litigation involving foreign government recipients of Title II aid, and § 211.2(e)(2) re-

quires the foreign government to pursue "collection of claims against persons" liable for lost or damaged commodities. Nothing is said, however, about carrier suits against foreign governments. Section 211.9(2)(g) does address "amounts paid by government recipients, "but provides that these amounts be deposited with the local American embassy, suggesting that the section refers only to the recipient's obligation to the United States.

Nothing in this discussion precludes a ruling that Regulation 11 supplies a substantive basis for liability against the SDR or the SSA; the point is that the SDR's acceptance of the terms of Regulation 11 does not constitute an implied waiver of the SDR's immunity from suit in United States courts.

### 2. Somali Shipping Agency

The other defendant, the Somali Shipping Agency, also raises jurisdictional objections. Several issues are not disputed. First, the SSA, as an "instrumentality" of the SDR, is a "foreign state" for immunity purposes under § 1603 of the Act (*see supra* note 3). Second, the SSA concededly engages in "commercial activity" in Somalia. *See* Def.Mem.Mo.Dis. at 25. Third and finally, plaintiff does not claim that the SSA waived its immunity. The narrow if not simple issues remaining are: 1) whether the SSA's commercial activity "bears the necessary relation to the United States" described by one of the three clauses of § 1605(a)(2), and 2) whether the SSA's contacts with the United States satisfy statutory and constitutional requirements governing exercise of personal jurisdiction.

### A. Subject-Matter Jurisdiction

The third clause of § 1605(a)(2), concerning acts outside the United States that cause a "direct effect in the United States," supplies subject-matter jurisdiction here. There is no question that plaintiff's claim is based upon an act connected "with a commercial activity of the foreign state elsewhere." The SSA detained plaintiff's ship in Somalia, and demanded certain payments in the course of its operation of the port at Kismayu. The difficulty comes in first understanding and then applying the statutory requirement of a "direct effect in the United States."

Some preliminary observations are in order. Courts employ a number of analytical adjectives in trying to give operational meaning to the "direct effects" language. The effect must be "substantial." *Harris v. VAO Intourist, supra,* 481 F.Supp. at 1063. It must "flow in a straight line, without deviation or interruption." *Upton v. Empire of Iran,* 459 F.Supp. 264, 266 (D.D.C.1978) (*aff'd,* 607 F.2d 494 (D.C.Cir. 1979). It must be "foreseeable" and "reasonably contemplated." *Maritime Int'l Nominees, supra,* 693 F.2d at 1111. Some courts, noting references in the legislative history, look to other sources of law. *See,*

*e.g., Harris v. VAO Intourist, supra,* 481 F.Supp. at 1063-64 (state long-arm statutes); *Carey v. National Oil Corp.,* 592 F.2d 673, 676 (2d Cir.1979) (*per curiam*) (constitutional "minimum contacts" cases).

Finally, courts look to both the nature of the alleged wrongdoing and to the nature of the plaintiff. The third clause of § 1605(a)(2) is not limited to tort cases; "it is explicitly intended to encompass effects resulting from commercial as well as tortious activities." *Maritime Int'l Nominees, supra,* 693 F.2d at 1111 (citations omitted). *See also Vencedora Oceanica Navigacion, supra,* 730 F.2d at 210 (Higginbotham, J., concurring in part and dissenting in part). The legal metaphysics resulting from this interpretation are perceptively and candidly described by Judge Kaufman in the *Texas Trading* opinion:

"Applying the term to a corporation is not so simple. Unlike a natural person, a corporate entity is intangible; it cannot be burned or crushed. It can only suffer financial loss. Accordingly, the relevant inquiry under the direct effect clause when plaintiff is a corporation is whether the corporation has suffered a "direct" financial loss.

"... Neither 'direct' nor 'in the United States' is a term susceptible of easy definition. A corporation is no more than a series of conduits, filtering profit—or loss—through each stage from the company's customers to its shareholders, who may themselves be fictional entities as well. Harm to any component is somewhat 'indirect,' and locating the site of the inquiry, especially when the harm consists in an omission, is an enterprise fraught with artifice. Courts construing either term should be mindful more of Congress's concern with providing 'access to the courts' to those aggrieved by the commercial acts of a foreign sovereign, *House Report* at 6605, than with cases defining 'direct' or locating effects under statutes passed for dissimilar purposes." *Texas Trading, supra,* 647 F.2d at 312-13.

In *Texas Trading*, the defendant foreign state breached both a contract to purchase cement and a related letter of credit. The Court found the existence of direct effects—*i.e.,* "financial loss in the United States"—in two factors: "first, the [plaintiffs] were to present documents and collect money in the United States. Second, each of the plaintiffs is an American corporation." *Id.* at 312.

■ Plaintiff here is an American corporation. Its ship was detained in Somalia. The SSA demanded additional payments as a condition for release of the ship, and it directed plaintiff to make those payments in the United States. Plaintiff complied. No doubt compliance was "foreseeable" or "reasonably contemplated" by defendant. A New York bank transferred funds to a Washington bank. Plaintiff also incurred additional charges in the United States to the vessel owner. Defendant is correct in observing that any commercial transaction has "consequential economic or financial implications," but it is difficult to imagine a method of discerning and measuring "direct effects" on a corporate plaintiff except in "economic" or "financial" terms. *Cf. id.* The disaster defendant foresees by a frank recognition that injuries registering on an income statement are "direct effects in the United States," *see* Def.Reply Mem. at 12–13, is not likely, for, as this case illustrates, there are a number of other legal screening devices that protect foreign defendants from being "forced into court in the U.S. for any alleged act relating to a commercial transaction." *Id.* at 13. *Cf. Vencedora Oceanica Navigacion, supra,* 730 F.2d at 205, 209 (Higgenbotham, J.). The personal jurisdiction and *forum non conveniens* doctrines are better designed to deal with the legitimate concerns articulated by the SSA, and the "direct effects" test in

§ 1605(a)(2) should retain a somewhat straightforward meaning in the commercial setting. In sum, defendant's commercial acts in Somalia caused "direct effects in the United States," and this Court has subject-matter jurisdiction over plaintiff's claims against the SSA.

### B. *Personal Jurisdiction*

■ The Act ties personal jurisdiction to sovereign immunity and subject-matter jurisdiction, *see* 28 U.S.C. § 1330(b); *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 81, 103 S.Ct. 1962, 1967 n. 5, 76 L.Ed.2d 81 (1983), but the statutory scheme is not dispositive. As in any other case, the exercise of personal jurisdiction over a foreign state is subject to constitutional due process limitations. *See Maritime Int'l Nominees, supra,* 693 F.2d at 1105 n. 18; *Gilson v. Republic of Ireland, supra,* 682 F.2d at 1028. *See generally* Lilly, *Jurisdiction Over Domestic and Alien Defendants,* 69 Va.L.Rev. 85, 116 (1983). The test, of course, derives from the familiar "minimum contacts" principle of *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In examining the "relationship between the defendant, the forum, and the litigation," *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977), the Court must find sufficient "contacts" or "affiliating circumstances" between the defendant and the forum, and it must consider a number of factors, including the "forum's interest in adjudicating the dispute," and the plaintiff's interest in "obtaining convenient and effective relief," in determining whether jurisdiction is "reasonable" and "fair." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980).[5]

---

5. Two aspects of the personal jurisdiction issue are noteworthy. First, the *Shaffer v. Heitner* standard is appropriate because the Court is considering exercise of "specific jurisdiction," *i.e.,* the controversy "is related to or 'arises out of' [the] defendant's contacts with the forum." *Helicopteros Nacionales de Colombia v. Hall,* —— U.S. ——, 104 S.Ct. 1868, 1872–73 & nn. 8–10 (1984). *See also Calder v. Jones,* 104 S.Ct. 1482,

1485–86, 80 L.Ed.2d 404 (1984); *INA v. Marina Salina Cruz,* 649 F.2d 1266, 1270 (9th Cir.1981). Jurisdiction thus does *not* turn on whether the SSA has "continuous and systematic" contacts with the forum, but rather on the "nature and quality of those ... contacts that are related to the cause of action." *Id.*

The hard issue in this case is whether the SSA has the necessary contacts with the United States. Its affidavits establish that it has no offices, employees, real property, or bank accounts in the United States. *See* Affidavit of Abdullah Mohamed Hirad at ¶¶ 6–10 (filed April 20, 1984). The SSA is listed in a number of shipping directories circulated in the United States, *see* Affidavit of Dennis Hamilton at ¶¶ 7–9 (filed April 23, 1984), but defendant denies that it intentionally solicits business in the United States. *See* Hirad Affidavit, *supra*, at ¶ 5; O'Callaghan Affidavit, *supra*, at ¶¶ 2–4. Nothing here suggests that defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum...." *World-Wide Volkswagen, supra*, 444 U.S. at 286, 100 S.Ct. at 559 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958)).

On the other hand, the SSA made repeated use of United States mails and telecommunications systems in its dealings with plaintiff. *See* Hamilton Affidavit, *supra*, at ¶¶ 10–15; *cf. Gilson v. Republic of Ireland, supra*, 682 F.2d at 1028. More importantly, the SSA specifically directed plaintiff to make the additional (and disputed) payments of July and August 1981 through the Somali Embassy in Washington and through purely American banking channels. *Cf. Helicopteros Nacionales de Columbia v. Hall, supra*, 104 S.Ct. at 1873 & n. 11. By so doing, the SSA:

> "explicitly recognized the relationship between [its] related activities and the forum, so that [its] contact with the forum was purposeful. Since the defendant will in most instances have undertaken this contact with the thought of deriving some benefit, these seem to be examples of 'purposeful availment' of the benefit of activities in the forum." Brilmayer, *How Contacts Count: Due Process Limitations on State Court Jurisdiction*, 1980 Sup.Ct.Rev. 77, 91, (1981).

Second, the jurisdictional inquiry looks to defendant's contacts with the United States, not simply to those with the forum. *See Texas Trading, supra*, 647 F.2d at 314; *East Europe*

There is no doubt that the SSA "availed itself of the benefits" of activities in the United States taken at its direction. This contact, in conjunction with its communications into the United States, may be minimal but it satisfies the minimum.

Furthermore, exercise of jurisdiction here is both "reasonable" and "fair" under the factor analysis set out by the Supreme Court. Certainly the forum—the United States—has a strong interest in "adjudicating the dispute." The plaintiff is an American corporation, and the case arose out of an American foreign assistance program. Questions of American law are involved. Litigation here is not particularly "convenient" for the SSA, but its insistence on plaintiff's taking certain actions here somewhat diminishes its claim of surprise at being "haled into court" in the U.S. *World-Wide Volkswagen, supra*, 444 U.S. at 286, 100 S.Ct. at 559.

■ In sum, the Court concludes that neither statutory nor constitutional limitations preclude its exercise of personal jurisdiction over the SSA. The only remaining issue is whether this is the appropriate forum in which to resolve the dispute.

### C. Forum Non Conveniens

Defendant finds further grounds for dismissal in the *forum non conveniens* doctrine. The Foreign Sovereign Immunities Act "does not appear to affect ... traditional doctrine," *Verlinden B.V. v. Central Bank of Nigeria, supra*, 103 S.Ct. at 1970 n. 15. Accordingly, the Court must apply another familiar test, first set out in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), and more recently described by the Supreme Court in *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) and the Court of Appeals in *Pain v. United Technologies Corp.*, 637 F.2d 775 (D.C.Cir.

*Domestic Int'l Sales Corp. v. Terra*, 467 F.Supp. 383 (S.D.N.Y.) *aff'd*, 610 F.2d 806 (2d Cir.1979); *Lilly, supra*, 69 Va.L.Rev. at 129.

1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981).

In *Pain v. United Technologies,* the Court of Appeals established a four-step inquiry:

"As a prerequisite, the Court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case. Next, the trial judge must consider all relevant factors of private interest, *weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice.* If the trial judge finds this balance of private interests to be in equipoise or near equipoise, he must then determine whether or not factors of public interest tip the balance in favor of a trial in a foreign forum. If he decides that the balance favors such a foreign forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice." *Id.* at 784–85 (emphasis supplied).

The first question is whether there is an "adequate alternative forum." *Id. See also Piper Aircraft v. Reyno, supra,* 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22. The *Reyno* case suggests that the requirement is satisfied whenever the foreign forum possesses the equivalents of personal and subject-matter jurisdiction, although "rare circumstances" may exist where the "remedy offered by the other forum is clearly unsatisfactory." *Id.* In this case, the only other possible forum is Somalia, where the SSA would litigate in its own courtrooms. This of course does not mandate a finding of inadequacy, and the SSA by affidavit maintains that the "laws of the SDR will not bar assertion of [plaintiff's] present claims and recovery thereupon against the SDR and/or SSA in the SDR." *See* Affidavit of Abdulrahan Mahamed Omer at ¶ 5 (filed December 6, 1983). On this basis, the Court concludes that there is an "adequate alternative forum."

■ The second step in the *Pain* inquiry looks to the "private interests" involved. This generally concerns the "relative ease of access to sources of proof," including the availability of witnesses and relevant documents. *See Pain, supra,* 637 F.2d at 746. Although the moving party need not identify each witness it may call, *see Reyno, supra,* 454 U.S. at 258, 102 S.Ct. at 267, it must make some showing of the "evidentiary problems it would face if the trial was held in the United States." *Id.* at 259, 102 S.Ct. at 267. Defendant does not describe any "problems" it may face, and the proof here appears to be primarily documentary in nature. In any event, the "balance of private interests" does not tip decisively in favor of the foreign forum, and the Court must proceed to the next step.

The third issue involves the "public interest" in deciding the case here. The analysis looks to the forum's "connection" to the suit, and to the court's "familiarity with governing law." *Pain, supra,* 637 F.2d at 791–92. The events underlying the case occurred in Somalia *and* in the District of Columbia; unlike *Pain,* this is not a case where there is a "lack of *any* significant contacts with the forum." *Id.* at 792 (emphasis in the original). Furthermore, as noted above, there is a legitimate "general national interest" in retaining the case. It arose from an American foreign assistance program, and indeed, the federal government initiated the relationship between the plaintiff and the SDR and the SSA. *Cf. Friends for All Children v. Lockheed Corp.,* 717 F.2d 602, 609–10 (D.C.Cir.1983). Finally, the matter presents questions of American law, including the SSA's potential liability under Title II regulations. Foreign law certainly will not "predominate." *Pain, supra,* 637 F.2d at 792. The "public interest" favors a determination to resolve the dispute here.

■ In sum, the "balance of private interests" is in "equipoise." The "balance of public interests" points to retaining the case. In view of these considerations, defendant has not overcome the strong presumption in favor of plaintiff's choice of forum. The *forum non conveniens* doctrine does not support dismissal.

Accordingly, the SDR's motion to dismiss is granted. The SSA's motion to dismiss is denied.